MARK D. LONERGAN (State Bar No. 143622)
mdl@severson.com
ALISA A. GIVENTAL (State Bar No. 273551)
aag@severson.com
SEVERSON & WERSON
A Professional Corporation
595 Market Street, Suite 2600
San Francisco, California 94105
Telephone: (415) 398-3344
Facsimile: (415) 956-0439

Attorneys for Defendant
**NISSAN MOTOR ACCEPTANCE COMPANY LLC f/k/a NISSAN MOTOR ACCEPTANCE CORPORATION**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MAYRA ARANDA,<br><br>        Plaintiff,<br><br>    vs.<br><br>NISSAN MOTOR ACCEPTANCE CORPORATION; EXPERIAN INFORMATION SOLUTIONS, INC.; TRANS UNION LLC; AND EQUIFAX INFORMATION SERVICES, LLC.,<br><br>        Defendant. | Case No. 2:21-CV-03451<br><br>**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>*[Filed concurrently with: Statement of Uncontroverted Facts;  Request For Judicial Notice; Declaration of Mark D. Lonergan; Declaration of Deborah Donley; Compendium of Evidence; and [PROPOSED] Judgment]; Proof of Service]*<br><br>Date:     December 13, 2022<br>Time:    10:00 a.m.<br>Crtrm.:  8D |

TO PLAINTIFF AND PLAINTIFF'S ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on December 13, 2022 at 10:00 a.m. in Courtroom 8D of the United States District Court for the Central District of California, located at 350 W. First Street, Los Angeles, California, Defendant NISSAN MOTOR ACCEPTANCE COMPANY LLC f/k/a NISSAN MOTOR ACCEPTANCE CORPORATION ("NMAC" or "Nissan") will, and hereby does, move for summary judgment on the ground that there is no genuine issue as to any

material fact and that Defendant is entitled to judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56.  The undisputed material facts establish that (1) Plaintiff's claim for violation of the California Consumer Credit Reporting Agencies Act is barred by the statute of limitations, and (2) Plaintiff's claim that NMAC failed to adequately investigate her dispute under the Fair Credit Reporting Act fails because Plaintiff never submitted a dispute of her Nissan lease accounts before filing the lawsuit.  For these reasons, and as set forth below in more detail, summary judgment is proper as to both of Plaintiff's claims.

This motion is based upon this notice of motion and motion, the accompanying memorandum of points and authorities, the statement of uncontroverted facts and conclusions of law, the Declarations of Deborah Donley and Mark Lonergan, the compendium of evidence submitted with this motion, all pleadings and papers on file in this action, and upon such other matters as may be presented to the Court at the time of the hearing.  This motion is made following the conference of counsel pursuant to L.R. 7-3 that took place on November 8, 2022.

DATED:  November 15, 2022

SEVERSON & WERSON
A Professional Corporation

By:    /s/ Mark D. Lonergan
      MARK D. LONERGAN

Attorneys for Defendant NISSAN MOTOR ACCEPTANCE COMPANY LLC f/k/a NISSAN MOTOR ACCEPTANCE CORPORATION

## Table of Contents

I. INTRODUCTION ................................................................................................1

II. FACTS .............................................................................................................3

   A. Background. ................................................................................................3

   B. Aranda's Contention That The Reporting On The Lease Accounts Was Inaccurate, And Her Discovery Of The Alleged Inaccuracies. ..............................4

   C. Aranda Should Have Known And In Fact Knew Of The Alleged "Inaccuracies" In NMAC's Reporting Prior To April 2019. ...................................5

   D. Mayra Authorized Her Husband Sergio To Access Her Credit Report And Use Her Information, And To Act On Her Behalf. ...........................................................8

   E. Plaintiff Sued NMAC Without Submitting a Dispute to Any Credit Reporting Agency Concerning NMAC's Credit Reporting. .........................................................9

III. SUMMARY JUDGMENT STANDARDS ......................................................9

IV. THE UNDISPUTED MATERIAL FACTS SHOW THAT NMAC IS ENTITLED TO JUDGMENT ..............................................................................11

   A. Aranda's CCRAA Claim Is Barred By The Two Year Statute of Limitations. 11

     1. The Statute of Limitations For The CCRAA Is Two Years From When The Plaintiff Knew Or Should Have Known Of The Allegedly Inaccurate Reporting. .................................................................................................................11

     2. Aranda Knew Or Should Have Known Of The Purported Inaccuracies In NMAC's Reporting Of The Lease Accounts Prior To April 22, 2019. ...............12

     3. All Information Which Either Mayra Or Sergio Knew Or Should Have Known From Reviewing Mayra's Credit Files Is Imputed To Mayra For Statute Of Limitations Purposes. .........................................................................................13

   B. The FCRA Claim Fails Because Plaintiff Never Submitted A Dispute Before Filing This Action. ......................................................................................................17

V. CONCLUSION .................................................................................................19

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**Cases**

4

5

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 106 S.Ct. 2505 (1986) ..................................................... 9, 10

6

7

*Bank of New York Mellon v. Citibank, N.A.*,
   8 Cal. App. 5th 935 (2017) ...................................................................... 14

8

9

*Baxter v. State Teachers' Ret. Sys.*,
   18 Cal. App. 5th 340 (2017) ..................................................................... 14

10

11

*Brand v. Mantor*,
   6 Cal. App. 2d 126 (1935) ......................................................................... 15

12

13

*Celotex Corp. v. Catrett*,
   477 U.S. 317, 106 S.Ct. 2548 (1986) ....................................................... 10

14

15

*Devereaux v. Abbey*,
   263 F.3d 1070 (9th Cir. 2001) (en banc) ................................................. 10

16

*E-Fab, Inc. v. Accts., Inc. Servs.*,
   153 Cal. App. 4th 1308 (2007) ................................................................. 13

17

18

*Fresno Motors, LLC v. Mercedes Benz USA, LLC*,
   771 F.3d 1119 (9th Cir. 2014) .............................................................. 9, 10

19

20

*Huizar v. Wells Fargo Bank, N.A.*,
   257 F. Supp. 3d 1103 (E.D. Cal. 2017) .................................................... 11

21

22

*Kruser v. Bank of America*
   230 Cal. App. 3d 741 (1991) ..................................................................... 14

23

24

*Malloy v. Fong*,
   37 Cal. 2d 356 (1951) ................................................................................ 15

25

26

*McDermott Int'l, Inc. v. Wilander*,
   498 U.S. 337, 111 S.Ct. 807 (1991) ........................................................... 9

27

*Nelson v. Chase Manhattan Mortg. Corp.*,
   282 F.3d 1057 (9th Cir. 2002) ............................................................ *passim*

28

*In re Nelson*,
   761 F.2d 1320 (9th Cir. 1985) ............................................................ 15

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
   210 F.3d 1099 (9th Cir. 2000) ............................................................ 10

*Peasley v. Verizon Wireless (VAW) LLC*,
   364 F. Supp. 2d 1198 (S.D. Cal. 2005) .............................................. 17

*River Colony Ests. Gen. P'ship v. Bayview Fin. Trading Grp., Inc.*,
   287 F. Supp. 2d 1213 (S.D. Cal. 2003) ......................................... 14, 15

*Rodriguez v. U.S. Healthworks, Inc.*,
   388 F.Supp.3d 1095 (N.D. Cal. 2019) (reversed and remanded on
   jurisdictional grounds in 813 Fed.Appx. 315)................................... 11

*Roybal v. Equifax*,
   405 F.Supp.2d 1177 (E.D. Cal. 2005) ................................................ 17

*Sand, Inc. v. United California Bank*,
   21 Cal. 3d 671 (1978) ......................................................................... 14

*Stalberg v. Western Title Ins. Co.*,
   230 Cal. App. 3d 1223 (1991) ............................................................. 13

*Warner v. Experian Information Solutions, Inc.*,
   931 F.3d 917 (9th Cir. 2019) .............................................................. 17

**Statutes**

15 USC § 1681i(a)(1)(A) ............................................................................ 18

15 USC §1681s-2(a) ................................................................................... 17

15 USC § 1681s-2(b) .................................................................................. 18

Cal. Civ. Code § 1785.33 ........................................................................... 11

Cal. Civ. Code §§ 2307-2309 ..................................................................... 15

Cal. Civ. Code § 2332 ................................................................................. 13

California Civil Code section 1785.25 ....................................................... 11

FCRA ................................................................................................ *passim*

N.Y. Pers. Prop. Law § 343(4)(c) ................................................................4

**Other Authorities**

Fed. R. Civ. P. Rule 56(a) ..........................................................................9

Fed. R. Civ. P. Rule 56(c)(1)(B) ...............................................................10

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiff Mayra Aranda ("Aranda," "Mayra" or "Plaintiff") is a former lease customer of Defendant NMAC.  She leased three vehicles from NMAC more than a decade ago, and NMAC reported the accounts as paid as agreed during the lease term.  Upon termination of her leases in 2010 and 2013, however, she owed thousands of dollars in end of lease charges that she has never paid.

This lawsuit focuses on the information that NMAC furnished to the consumer reporting agencies or "CRAs"[1] about Aranda's leases after they ended.  Aranda claims that information was inaccurate, as can be seen from a "cursory review" of her credit report, but she claims she never discovered these inaccuracies until years later, in April of 2021, when she was reviewing her credit report in connection with a mortgage application.

Aranda has sued NMAC for inaccurate credit reporting in violation of the California Consumer Credit Reporting Agencies Act ("CCRAA").  Now that discovery has concluded, there is no genuine dispute of fact that Aranda's CCRAA claim is barred by the two year statute of limitations because she knew or should have known of the supposed inaccuracies in her NMAC accounts before April 22, 2019.

Mayra and her husband Sergio have closely monitored their credit for years, making dozens of consumer inquiries into Mayra's credit file prior to April 2019.  In April 2017, Mayra opened an account with Credit Karma, a well-known credit

---

[1] "CRAs," sometimes referred to as credit bureaus, are companies that collect and maintain data about a consumer's credit history received from "furnishers" (usually creditors), compile that data into credit reports, and provide those reports to individuals or companies with a permissible purpose for reviewing the consumer's credit history.  The largest, most well-known CRAs are Trans Union, Equifax and Experian.

monitoring service, and Mayra and Sergio frequently use her Credit Karma application or "app" to check her credit.

Further, the Arandas have used her Credit Karma app to review accounts appearing on Mayra's credit report and dispute accounts believed to contain inaccurate information, which requires the user to open up and review the account information.  Aranda successfully removed four such accounts from her credit report in 2018 alone.  In June of 2017, ***she even opened a dispute into one of the Nissan lease accounts at issue in this lawsuit***—but cancelled that dispute.

In light of this evidence, there is no genuine dispute that Aranda not only "should have known," but in fact did know of the supposed inaccuracies in her NMAC accounts before April 2019.

The outcome is the same whether it was Mayra, Sergio or both who checked her credit and disputed accounts believed inaccurate.  Mayra has repeatedly testified that Sergio was responsible for handling the family's finances, and she claims to know nothing about the Nissan lease accounts or the contents of her credit report.  However, she concedes that her husband was acting with her "full authorization," and that she specifically gave him permission to access her credit reports, check her credit score and even apply for loans on her behalf.  Since any information known or available to an agent is imputed to his principal for statute of limitations purposes, Mayra Aranda's CCRAA claim is time-barred.

Aranda's claim for violation of the FCRA fares no better.

She sues NMAC under the statute's "reinvestigation provisions," which allow consumers to submit disputes to the CRAs, require the CRAs to notify the furnisher of the specific dispute, and then obligate the furnisher to investigate and respond.  This pre-suit dispute resolution procedure was added to the FCRA to give consumers the ability to quickly resolve credit reporting issues and minimize litigation over alleged inaccuracies in credit report.  *Nelson v. Chase Manhattan Mortg. Corp.*, 282 F.3d 1057, 1059-60 (9th Cir. 2002).

The problem with Aranda's FCRA claim is that she never submitted a dispute before filing suit.  Instead, she immediately sued NMAC and the three CRAs in April 2021, when she says she learned of the inaccuracies in her credit report.  She does not even contend that she submitted a dispute to the CRAs before initiating litigation; she is instead pursuing the novel theory that her filing of the lawsuit *was* the dispute.  This theory is without legal merit or support, and adopting it would defeat the purpose of the FCRA's reinvestigation procedures, which is to reduce litigation over alleged inaccuracies in credit reports.

For these reasons, which are explained in greater detail below, the uncontroverted material facts demonstrate that NMAC is entitled to judgment as a matter of law.

## II.   FACTS

### A.   Background.

Plaintiff Mayra Aranda leased three different Infiniti vehicles from NMAC, two in mid-2007 and one on January 1, 2011.  The term of each lease was 39 months.  The first two leases terminated in late 2010, while Aranda terminated the final lease early, in 2013.  FAC ¶¶ 29-30; Donley Depo., 134:3-16.

Aranda's payment history was generally satisfactory, to the point that NMAC reported the accounts "paid as agreed" while the leases were in effect.[2]  When she returned the vehicles upon termination, she was assessed various charges in accordance with the terms of the lease, including for excess mileage and wear and tear to the vehicle.  Aranda has never paid these outstanding end of lease charges, which are $5,940, $10,763 and $9,019 for the three vehicles, respectively.  Donley Depo, 80:18-81:1; 116:12-10; 62:15-25.

---

[2] She was late on several payments on one of her accounts, but made those payments up before she went 30 days past due so was never reported to the CRAs as derogatory.  Donley Depo., 60:9-25; 62:6-14.  While Aranda owed additional rent and charges for excess wear and mileage at the end of her lease term, those charges were added to her end of lease balances.  Donley Depo., 128:7-129:3.

Initially NMAC furnished information to CRAs that the unpaid end of lease charges had been charged off.  However, it later changed its credit reporting procedures to eliminate negative reporting on accounts with unpaid end of lease charges.  Under the new policy, if a lease was terminated without the account having been charged off and repossessed, NMAC would report the account as paid as agreed, even if the customer still owed end of lease charges.  Donley Depo., 63:6-13; 68:18-25.[3]  Since at least April of 2017 (when Aranda signed up for credit monitoring services through Credit Karma; see below) until early 2021, Aranda has reported the accounts as paid as agreed with a balance owing.  Donley Decl., ¶¶ 2-3.

**B.    Aranda's Contention That The Reporting On The Lease Accounts Was Inaccurate, And Her Discovery Of The Alleged Inaccuracies.**

Aranda contends that, in April 2021, approximately 8-11 years after her leases were terminated, she discovered that NMAC had been furnishing inaccurate information to the CRAs regarding these accounts.  FAC, ¶¶ 19-25.

Aranda's lawsuit alleges that it was inaccurate for NMAC to report that there was a balance still owed on the lease accounts, since she "does not owe any money," and that NMAC's reporting "gives the impression" that the accounts are still open.  FAC, ¶¶ 18, 25, 31.[4]  These inaccuracies were so obvious, she says, they could have been discovered with just a "cursory review" of her credit report.  FAC, ¶33.

---

[3] This reporting is more favorable to consumers and complies with the law in states such as New York which prohibit lessors from reporting lease accounts as derogatory based on unpaid charges for excess wear and damage, unless a judgment is obtained against the lessee.  N.Y. Pers. Prop. Law § 343(4)(c).

[4] Aranda makes the counter-intuitive suggestion that NMAC *should have* reported her accounts as derogatory, because she believes this would have obligated NMAC to stop reporting the accounts after seven years.  And even though she does not dispute that she never paid the end of lease charges, she still insists that she "does not owe" NMAC money, apparently because the statute of limitations has run on an action to collect these charges.  Plaintiff's theories are wrong for a host of reasons.  But they will not be addressed in this motion because NMAC is seeking summary judgment based solely upon its statute of limitations defense.

Plaintiff filed this lawsuit on April 22, 2021, one week after receiving her credit report and the day after she failed to obtain an automated pre-approval of a mortgage application. NMAC answered the complaint by alleging, among other defenses, that Aranda's claim was barred by this two year statute of limitation. Dkt. 68, p. 15, page ID #461.

**C.    Aranda Should Have Known And In Fact Knew Of The Alleged "Inaccuracies" In NMAC's Reporting Prior To April 2019.**

As described above, Aranda alleges that April 2021 is the first time she learned of the inaccuracies for which she is now suing. But now that discovery has been completed, the evidence makes clear that Aranda not only should have known but knew of these supposed inaccuracies long before then.

Not only are credit reports readily available to consumers, but Mayra and Sergio Aranda in fact closely monitored their credit for years prior to their April 2021 mortgage application. The evidence that proves this includes documents and deposition testimony obtained from the three major CRAs, Credit Karma (the largest credit monitoring service in the country), and Plaintiff herself.

Equifax, one of the three nationwide CRAs, produced 335 pages of "frozen scans" in this lawsuit that detail the activities on Mayra Aranda's credit file going back to March 2010. Equifax's witness described the inquiries section of that file, and testified that inquiries with a "CONS RPT" notation are instances in which the consumer herself inquired into her credit file. Stephens Depo., 16:7-18:2; 18:8-12; 100:23-101:9. Mayra Aranda's credit file with Equifax shows there were at least 20 such consumer inquiries prior to April 21, 2019. See pages from Equifax's "frozen scans" identified in NMAC's Statement of Uncontroverted Facts ("SUF"), Fact No. 2.

While Aranda's older credit reports are no longer available, the credit reports that were produced likewise reflect a pattern of Aranda inquiring into her own credit file (which shows up as a "soft inquiry" on the report). For example, Aranda

ordered her credit report from Trans Union on September 6, 2019, and the "account review inquiries" section of that reports shows several instances of her reviewing her accounts.  Trans Union September 6, 2019 credit report, TU 0006--021, at TU 0016.

In April of 2017, Mayra Aranda applied for an account with Credit Karma, the nation's largest credit monitoring service.  Deposition of Warren Church, 16:13-19; 18:8-15; 19:11-15.[5]  To open her account, Aranda had to provide her Social Security number and other personal information.  Church Depo., 21:2-8.  This account was unique to Mayra—Credit Karma does not allow more than one person to register for an account.  Church Depo., 21:12-15.  To access her Credit Karma account, Aranda had to log in with a password, PIN or biometric identifier (Touch ID or Face ID) unique to her.  Church Depo., 22:14-23:12.

The Credit Karma application offers consumers a variety of tools to monitor their credit.  For example, users can check their credit scores and review accounts ("tradelines") found in their credit report, payment histories and inquiries into their credit file.  Church Depo., 33:14-34:9, 35:8-16.  There were 39 logins to Mayra Aranda's Credit Karma account between April 2017 and April 2019.  CK000001-CK000003; Church Depo., 71:18-72:5; 72:17-73:1; 13:14-23.

Equifax's records reflect that it received more than 20 consumer inquiries into Aranda's credit file through Credit Karma prior to April 2019.  See SUF, Fact Nos. 33-36.  And according to Credit Karma's records, Mayra Aranda's credit score was checked using the app more than 50 times between April 2017 and April 2019.  SUF, Fact No. 12, CK0000020-CK0000024.

Credit Karma account holders can also use the app to dispute inaccurate information found in their credit report.  To use this feature, the customer must open

---

[5] Aranda also had an earlier Credit Karma account, Church Depo., 18:16-19:5, but information regarding that account is no longer available.

the particular account they wish to dispute, click on a button that says "Dispute," and follow the directions on the app.  Church Depo., 35:8-16; 38:14-39:10; 114:2-115:10.  This feature can only be used while the consumer is reviewing the particular account.  Church Depo., 117:4-14.

The evidence establishes that Aranda knew how to use and in fact used this Credit Karma feature as well.  In 2018, four different disputes were opened on Aranda's account, on January 8, January 22, February 11 and July 29.  Each of these disputes was resolved in Aranda's favor, resulting in the removal of four adverse accounts from her credit report.  Church Depo., 85:12-86:20; 91:25-92:14; 145:3-6; CK000004 (list of "Direct Disputes" opened on Aranda's account).[6]

The NMAC tradelines were designated as "adverse accounts" by Trans Union on its credit report.  TU 0008-0011.  Such accounts are brought to the attention of a Credit Karma app user via a special alert or flag.  Church Depo., 48:7-49:13.

On June 13, 2017, Aranda used her Credit Karma app to open up a dispute concerning one of her Nissan Infiniti lease accounts.  Church Depo., 92:15-25; 93:25-94:22; CK000001, CK000004.  However, Aranda cancelled this dispute, so it was never submitted to the CRA (or NMAC) for resolution.  Church Depo., 93:1-18; CK000004.[7]  Thus, nearly four years before filing this lawsuit, Plaintiff reviewed her Nissan lease account on her Credit Karma app, opened up a dispute of the information contained in the tradeline, but then withdrew the dispute.

---

[6] Aranda successfully disputed a fifth account on September 6, 2019 (a date that is within the limitations period).  Church Depo., 91:25-92:14; CK 000004.  This dispute was submitted the same day that Aranda ordered her credit report from Trans Union.  TU 0006.  In response to Aranda's dispute requesting that the account be verified, it too was removed from her credit report.  TU 00005.

[7] Why Aranda cancelled the dispute of her Nissan account is unknown and not relevant to this motion.  However, as explained above, see page 6, fn. 3, Nissan's reporting of the account was more favorable to Aranda than the derogatory comments she apparently contends should have been reported to the CRAs.

**D.**   **Mayra Authorized Her Husband Sergio To Access Her Credit Report And Use Her Information, And To Act On Her Behalf.**

At her deposition, Mayra Aranda claimed to be unable to provide any details about her Nissan leases, the end of lease charges on her accounts, the contents of her credit report, or Aranda's April 2021 mortgage application.  In response to NMAC's motion to reopen her deposition, Mayra explained her professed lack of knowledge: "My husband, Sergio Aranda ("Sergio"), handles the finances for our family, including applying for credit and/or loans.  Sergio has permission to use my information when he deems it is in the best interests of our family."  Dkt. 90, ¶3.

After the Court ordered that her deposition be reopened, Mayra gave a second deposition on October 26, 2022 and provided the following explanation of her agreement with her husband:

> Q.  And then looking at the second sentence, is it true that you have authorized Sergio to use your information whenever he deems it in the best interest of your family?
> A. That's true.
> Q.  And have you authorized your husband, Sergio, to apply for loans in your name?
> A. He has my full authorization.
> Q. And does that include the authorization to apply for loans in your name?
> A.  Correct.
> Q.  Have you authorized your husband, Sergio, to submit your credit information to lenders as part of loan applications?
> A.  He has my full authorization to make any financial decision for my family.
> Q. And does your full authorization include his ability to submit your credit information to lenders as part of the loan application?
> A.  He has my authorization.
> Q. Okay. Ms. Aranda, my question is given the full authorization that you've given your husband, Sergio, in your view, does that include authorization to submit your credit information to lenders as part of loan applications?
> A. Yes.
> * * *
> Q. So, Ms. Aranda, when you wrote in this declaration that, "Sergio has permission to use my information when he deems it in the best interest of our

family," did you include within that your authorization to pull your credit report? [objections omitted]

A. Yes.

Mayra Aranda Depo., Vol. 2, 23:23-24:24; 27:5-15; see also deposition testimony cited in SUF, Fact No.9.

## E. Plaintiff Sued NMAC Without Submitting a Dispute to Any Credit Reporting Agency Concerning NMAC's Credit Reporting.

Plaintiff's complaint does not allege that she disputed NMAC's reporting of the lease accounts prior to filing her lawsuit on April 22, 2021. Rather, she alleges that the filing this lawsuit was itself a "dispute" sufficient to trigger NMAC's reinvestigation obligations under the FCRA. FAC ¶¶ 51-54; Plaintiff's Reply Memorandum in Support of Plaintiff's Motion to Amend Complaint, Dkt. 53, at 4:11-18. It is undisputed that, before filing her lawsuit, Aranda never disputed the accuracy of any information NMAC furnished to the CRAs. Stephens Depo., 47:22-48:4; 78:2-9; 103:11-14; FAC ¶¶ 51-54.

## III. SUMMARY JUDGMENT STANDARDS

The basic standard for granting summary judgment is that the court must find there is "no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56(a). "[S]ummary judgment … is mandated where the facts and the law will reasonably support only one conclusion." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 356, 111 S.Ct. 807, 818 (1991).

"Material" facts are those that, under applicable substantive law, may affect the outcome of the case: "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986); *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir.

2014).  Disputes over matters that do not affect the right to recover under applicable substantive law do not prevent entry of summary judgment.  That is, facts unnecessary to the decision at trial are not "material" on a motion for summary judgment.  *Anderson v. Liberty Lobby, Inc*., *supra*, 477 U.S. at 248, 106 S.Ct. at 510.

A factual dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., *supra*, 477 U.S. at 248, 106 S.Ct. at 2510; *Fresno Motors, LLC v. Mercedes Benz*, *supra*, 771 F.3d at 1125.

A defendant may carry its initial burden on summary judgment by showing that the plaintiff lacks sufficient evidence to carry its ultimate burden of persuasion at trial; i.e., the plaintiff does not have evidence from which a jury could find an essential element of the plaintiff's claim.  Fed. R. Civ. P. Rule 56(c)(1)(B); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554 (1986); *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000).  This is because it is the plaintiff's burden to show a triable issue of fact as to matters on which it will bear the burden of persuasion at trial: "A complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, *supra*, 477 U.S. at 323, 106 S.Ct. at 2552.  "[T]he Celotex 'showing' can be made by pointing out through argument—the absence of evidence to support plaintiff's claim." *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

## IV.   THE UNDISPUTED MATERIAL FACTS SHOW THAT NMAC IS ENTITLED TO JUDGMENT

**A.   Aranda's CCRAA Claim Is Barred By The Two Year Statute of Limitations.**

> **1.   The Statute of Limitations For The CCRAA Is Two Years From When The Plaintiff Knew Or Should Have Known Of The Allegedly Inaccurate Reporting.**

In Count II of her complaint, Aranda alleges that NMAC violated the CCRAA, California Civil Code section 1785.25, by furnishing inaccurate information to the CRAs concerning her Nissan lease accounts.  Specifically, she alleges that NMAC's reporting was inaccurate because the accounts were closed, they no longer had a balance, and she did not owe any money to NMAC.  FAC, ¶80.

A claim under the CCRAA must be brought "within two years from the date the plaintiff knew of, or should have known of, the violation . . . ."  Cal. Civ. Code § 1785.33.  The limitations period begins running once the plaintiff "discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the violation,' ... irrespective of whether the actual plaintiff undertook a reasonably diligent investigation."  *Huizar v. Wells Fargo Bank, N.A*., 257 F. Supp. 3d 1103, 1109 (E.D. Cal. 2017).

Reasonable diligence requires that a plaintiff pay heed to the information available to her.  For example, in one case interpreting the statute of limitation under the CCRAA, the Court found that a reasonably diligent plaintiff would have concluded on her first day of work that her employer had pulled her credit report, triggering the CCRAA statute of limitations, since her employment was conditioned on a successful background check.  *Rodriguez v. U.S. Healthworks, Inc*., 388 F.Supp.3d 1095 (N.D. Cal. 2019) (reversed and remanded on jurisdictional grounds in 813 Fed.Appx. 315).

/ / /

Plaintiff filed this action on April 22, 2021.  Therefore, if Plaintiff (or her husband, as discussed below) knew of the supposedly inaccurate NMAC credit reporting prior to April 22, 2019, or should have known of the inaccuracies in the exercise of reasonable diligence, the statute of limitations has expired.

## 2. Aranda Knew Or Should Have Known Of The Purported Inaccuracies In NMAC's Reporting Of The Lease Accounts Prior To April 22, 2019.

The evidence set forth at pages 7-10 above establishes that the Arandas closely monitored their credit for years prior to their April 2021 mortgage application.  Equifax's records confirm that it received dozens of consumer inquiries into Mayra Aranda's credit file prior to April 2019, both through Credit Karma and from Mayra Aranda directly.  Aranda ordered her credit report from Trans Union on September 6, 2019 and, on that same date, she disputed an item on that credit report.  Aranda thus not only had the ability to obtain her credit report, but she knew how to dispute items appearing in the report.[8]  This evidence alone shows that, in the exercise of reasonable diligence, Aranda could and should have discovered the supposed inaccuracies in her NMAC lease accounts prior to April 2019.

But the evidence produced by Credit Karma removes any doubt as to whether Aranda "should have known" of the alleged inaccuracies.  Aranda signed up for credit monitoring services from Credit Karma in April 2017 and logged on to her account 39 times prior to April 2019.  She used her Credit Karma app on four occasions in 2018 to dispute accounts that she believed contained inaccurate information.  To do this, Aranda necessarily reviewed accounts appearing on her credit report.  This is so because, to initiate a dispute, the Credit Karma app user is

---

[8] The first page of Aranda's Trans Union credit report included directions on how to dispute any inaccurate items found in the report.  TU 0006.  Detailed instructions on how to submit disputes are also provided consumers by the CFPB and other regulators.  See, e.g., https://www.consumerfinance.gov/owning-a-home/prepare/check-your-credit/

required to navigate to an account or tradeline and "click into" or open that account in order to access the "dispute" button.  Church Depo., 38:14-39:10; 114:2-115:10; 117:4-7; 130:3-15; 133:6-134:13.

Further, Aranda even opened a dispute *of one of the Nissan lease accounts at issue* in June of 2017.  This establishes *actual* knowledge of the alleged inaccuracies, since Aranda had to access the account in order to press the "dispute" button and open a dispute of the information being reported by Nissan.

Thus, the undisputed facts not only show that Aranda "should have known" of the alleged inaccuracies, but that she in fact had actual knowledge of the alleged inaccuracies.

### 3. All Information Which Either Mayra Or Sergio Knew Or Should Have Known From Reviewing Mayra's Credit Files Is Imputed To Mayra For Statute Of Limitations Purposes.

Given Aranda's repeated assertions that it was her husband who handled the family's finances, she may try to argue that only Sergio was aware of allegedly inaccurate NMAC accounts on her credit report.  However, she cannot avoid the bar of the statute of limitations by claiming ignorance.

### (a) Information known to or discoverable by an agent is imputed to the principal for statute of limitations purposes.

When determining accrual of a statute of limitations, "Notice possessed by one person—actual or constructive—may be imputed to another person."  *E-Fab, Inc. v. Accts., Inc. Servs.*, 153 Cal. App. 4th 1308, 1319 (2007).  This rule is found in case law as well as California's Civil Code.  *See* Cal. Civ. Code § 2332 ("As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other.")

For example, an attorney's knowledge of facts suggesting a claim exists will be imputed to the client and trigger the statute of limitations.  *Stalberg v. Western*

*Title Ins. Co.*, 230 Cal. App. 3d 1223, 1231 (1991).  In *Bank of New York Mellon v. Citibank*, plaintiff's assertion of delayed discovery was rejected because its escrow agent had knowledge of facts the established a possible dispute regarding lien priority.  *Bank of New York Mellon v. Citibank, N.A.*, 8 Cal. App. 5th 935, 956–957 (2017).  And the plaintiff in *Sun 'n Sand, Inc. v. United California Bank*, 21 Cal. 3d 671, 702 (1978) was charged with knowledge that its agent should have learned from a review of bank statements, resulting in its fraud claim being found barred by the statute of limitations.

This same principle applies to spouses.  One spouse may not avoid dismissal of time-barred claims by arguing that responsibility for remaining diligent was delegated to the other.  In *Kruser v. Bank of America* 230 Cal. App. 3d 741, 749 (1991), for example, the court dismissed the claims of the plaintiff spouses based on their failure to notify the defendant bank of unauthorized charges to their account within the applicable time-period.  The claims of both plaintiffs were dismissed even though only the wife reviewed the statements: "The understanding [the husband] had with Mrs. Kruser that she would review the bank statements did not excuse him from his obligation to notify the bank of any unauthorized electronic transfers."  *Kruser v. Bank of America*, 230 Cal. App. 3d 741, 749 (1991).

The law is thus clear: a party cannot avoid the statute of limitations by claiming she was *personally* unaware of information known to her agent.  "One who acts through an agent will be presumed to know all that the latter learns concerning the transaction, whether it is actually communicated to the principal or not."  *Baxter v. State Teachers' Ret. Sys.*, 18 Cal. App. 5th 340, 366–67 (2017) (citing *Shapiro v. Equitable Life Assur. Soc. of U.S.*, 76 Cal. App. 2d 75, 87 (1946); *see also River Colony Ests. Gen. P'ship v. Bayview Fin. Trading Grp., Inc.*, 287 F. Supp. 2d 1213, 1227 (S.D. Cal. 2003).  "There is no difference in this respect between actual and constructive notice.  It is of no avail that the agent failed to communicate to his principal what he had ascertained."  *Id*.  "Included among the types of information

1  that may be imputed from agent to principal are facts used to determine the date of

2  accrual of a statute of limitations."  *Id.* (citing *Santillan v. Roman Catholic Bishop of*

3  *Fresno*, 163 Cal. App. 4th 4, 11 (2008)).

4             **(b)**      **Sergio was Mayra's agent with regard to credit and finances.**

5        Agency and the scope of an agent's authority may be established informally

6  by the conduct of the parties.  *In re Nelson*, 761 F.2d 1320, 1322 (9th Cir. 1985);

7  *Malloy v. Fong*, 37 Cal. 2d 356, 372 (1951); *Brand v. Mantor*, 6 Cal. App. 2d 126,

8  130 (1935).  "No particular words are necessary, nor need there be consideration."

9  *Malloy*, *supra*, 37 Cal. 2d at 372; *see* Cal. Civ. Code §§ 2307-2309.

10        An agency arises between spouses based simply upon one spouse's

11  knowledge and acquiescence to the other acting on her behalf on financial matters:

12       There was testimony at trial that, during their marriage, the appellant
was aware of the fact that Nelson had signed her name to documents.

13  The appellant testified at a deposition that she knew that Nelson had
signed her name to loan documents and that Nelson had the authority to

14  do so. In addition, the appellant permitted Nelson to handle her
personal finances, including the balancing of her bank accounts and the

15  completion and signing of her federal income tax returns.

16

17

18  *In re Nelson*, 761 F.2d at 1322 (finding a husband had authorization to encumber his

19  wife's property).

20        Here, the evidence is undisputed that Mayra authorized Sergio to handle

21  financial matters for the family and to use her credit information for that purpose.

22  Aranda herself avers that is true: "My husband, Sergio Aranda ("Sergio"), handles

23  the finances for our family, including applying for credit and/or loans.  Sergio has

24  permission to use my information when he deems it is in the best interests of our

25  family."  Dkt. 90, ¶3.  And as she acknowledged in her sworn deposition testimony,

26  this "full authorization" she granted to Sergio included the right to access her credit

27  reports, check her credit score, and even apply for credit in her name.  Mayra

28  Aranda Depo, Volume 2, 23:6-29:10.

Like the spouse in *Nelson*, Sergio was even authorized to apply for loans in Mayra's name.  While Plaintiff claims NMAC prevented her from being approved for a mortgage, FAC, ¶¶ 41-50, it turns out the Arandas were approved for a mortgage in October 2020 after Sergio authorized Rocket Mortgage to pull Mayra's credit report and he successfully applied for a mortgage in both their names.  Rocket Mortgage 002.  While Mayra contends this mortgage approval was obtained without her "express knowledge," Dkt. 90, ¶4, it was accomplished pursuant to the authority that Mayra delegated to Sergio to act as her agent.

Not only did Mayra give her husband unlimited authority to use her credit information, she necessarily helped him gain access to the Nissan lease accounts as well—by providing her Social Security number needed to pull her credit reports, as well as her password, PIN or other information needed to access her Credit Karma account.  Mayra had the ability to authorize Sergio to use her Credit Karma account by sharing her log on credentials with her husband.  Church Depo., 23:13-21.  Sergio acknowledges using the Credit Karma app to review their credit, and suggests his wife participated as well.  Sergio Aranda Depo, 45:19-20 ("We have Credit Karma.  We looked at our credit."); *see also*, Mayra Aranda Depo, 27:5-15 ("Ms. Aranda, when you wrote in this declaration that, 'Sergio has permission to use my information when he deems it in the best interest of our family,' did you include within that your authorization to pull your credit report?  [objections omitted]  A. Yes.").

It is immaterial whether it was Sergio or Mayra who monitored her credit, or whether they both did so together.  The evidence is undisputed that the Arandas closely monitored her credit, made numerous inquiries into Mayra's credit file, pulled her credit reports, initiated disputes of inaccurate information found in those reports, and even initiated a dispute into one of the Nissan lease accounts at issue.  Given the agency relationship that indisputably existed between the Arandas, all information that Sergio knew or should have known about his wife's credit is

1    chargeable to Mayra.  Thus, Mayra's claim for violation of the CCRAA is barred by
2    the two year statute of limitations.

3    **B.     The FCRA Claim Fails Because Plaintiff Never Submitted A Dispute**
4           **Before Filing This Action.**

5           Plaintiff's other count is for violation of the FCRA.  In it Aranda alleges that
6    NMAC failed to adequately investigate her "dispute" of inaccurate information
7    reported on her Nissan lease accounts.  This claim fails because Aranda never
8    disputed NMAC's reporting prior to filing this lawsuit.

9           The FCRA obligates furnishers of credit information to report complete and
10   accurate information to the CRAs.  15 USC §1681s-2(a).  However, there is no
11   private right of action against furnishers for failure to comply with this requirement.
12   *Nelson v. Chase Manhattan Mortg. Corp.*, 282 F.3d 1057, 1059-60 (9th Cir. 2002).

13          Instead, Congress required consumers to first lodge a dispute with a credit
14   reporting agency.  The CRA, in turn, is required to notify the furnisher of the dispute
15   and provide all relevant information received from the consumer, after which the
16   furnisher is obligated to investigate and confirm or correct the disputed information.
17   *Id.*  Only if the consumer first lodges a dispute with the CRA, and the furnisher
18   conducts an unreasonable investigation and fails to correct the information, may the
19   consumer sue the furnisher.  *Id.*

20          To trigger a furnisher's reinvestigation obligations, the consumer must
21   directly contact the CRA and notify the CRA of his or her dispute.  This requirement
22   is strictly construed.  Notifications that do not come directly from the consumer are
23   invalid.  *Warner v. Experian Information Solutions, Inc.*, 931 F.3d 917, 921 (9th Cir.
24   2019) (pre-suit dispute letter sent by credit repair agency insufficient to trigger
25   reinvestigation obligations).  Even if the consumer lodges a pre-suit dispute with the
26   furnisher, the furnisher cannot be held liable because the FCRA requires the
27   consumer to notify the CRAs of her dispute.  *Roybal v. Equifax*, 405 F.Supp.2d
28   1177, 1180 (E.D. Cal. 2005); *Peasley v. Verizon Wireless (VAW) LLC*, 364 F. Supp.

2d 1198, 1199 (S.D. Cal. 2005).

The Ninth Circuit explains the purpose of this pre-lawsuit dispute requirement as follows:

> Congress did not want furnishers of credit information exposed to suit by any and every consumer dissatisfied with the credit information furnished. Hence, Congress limited the enforcement of the duties imposed by § 1681s-2(a) to governmental bodies. But Congress did provide a filtering mechanism in § 1681s-2(b) by making the disputatious consumer notify a CRA and setting up the CRA to receive notice of the investigation by the furnisher.

*Nelson*, *supra*, 282 F.3d at 1060.[9]

Although Aranda alleges that NMAC failed to satisfy its reinvestigation obligations under 15 USC § 1681s-2(b), she does not and cannot allege that she submitted a dispute to the CRAs prior to filing her lawsuit. She instead relies on the theory that her filing of the lawsuit should be deemed a "dispute." FAC, ¶¶ 51-52; Stephens Depo., 47:22-48:4; 78:2-9; 103:11-14.

In seeking leave to belatedly add a claim for violation of the FCRA, Aranda and her attorneys acknowledged that they were surprised to learn that Experian, one of the CRAs, had treated her lawsuit as a dispute and sent an ACDV to NMAC. Plaintiff's Reply Memorandum in Support of Plaintiff's Motion to Amend Complaint, Dkt. 53, at 4:11-18. So, at the time the complaint was filed on April 22, 2021, neither Aranda nor her attorneys considered her complaint to be the "direct consumer dispute" required under 15 USC § 1681i(a)(1)(A). This is a characterization they are urging after the fact in an attempt to bootstrap themselves into an FCRA claim.

---

[9] As noted above, the CFPB provides consumers with detailed instructions on how to lodge a dispute with a credit reporting agencies, explaining that it can be done by mail, telephone, or online, and explaining the process. *See* https://www.consumerfinance.gov/ask-cfpb/how-do-i-dispute-an-error-on-my-credit-report-en-314/.

1    As explained by the Ninth Circuit in *Nelson*, the pre-lawsuit notification
2 requirement is intended to avoid unnecessary lawsuits.  Interpreting the filing of a
3 lawsuit to satisfy this requirement would defeat the purpose of the filtering
4 mechanism built into the FCRA.  If Aranda's position were correct, every lawsuit
5 alleging inaccurate reporting would give rise to a claim for violation of the FCRA,
6 defeating the purpose of the statutory scheme.

7    Because Aranda did not provide the CRAs with pre-suit notice that she
8 disputed NMAC's reporting of her accounts, and she did not give NMAC an
9 opportunity to correct any alleged inaccuracies before she commenced litigation, the
10 Court should also grant summary judgment as to her FCRA claim.

## V.    CONCLUSION

12    For all of the above reasons, the evidence shows that NMAC is entitled to
13 judgment as a matter of law on both of Plaintiff's claims and the Court should grant
14 summary judgment in favor of Defendant.

15 DATED:  November 15, 2022          SEVERSON & WERSON
16                                    A Professional Corporation

18                                    By:  ____/s/ Mark D. Lonergan____
19                                         MARK D. LONERGAN

20                                    Attorneys for Defendant NISSAN MOTOR
21                                    ACCEPTANCE COMPANY LLC f/k/a
22                                    NISSAN MOTOR ACCEPTANCE
                                      CORPORATION