1 | MARK D. LONERGAN (State Bar No. 143622)
mdl@severson.com
2 | ALISA A. GIVENTAL (State Bar No. 273551)
aag@severson.com
3 | SEVERSON & WERSON
A Professional Corporation
4 | 595 Market Street, Suite 2600
San Francisco, California 94105
5 | Telephone: (415) 398-3344
Facsimile: (415) 956-0439
6 |
Attorneys for Defendant
7 | **NISSAN MOTOR ACCEPTANCE**
**COMPANY LLC f/k/a NISSAN**
8 | **MOTOR ACCEPTANCE**
**CORPORATION**
9 |

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MAYRA Aranda,<br><br>       Plaintiff,<br><br>   vs.<br><br>NISSAN MOTOR ACCEPTANCE CORPORATION; EXPERIAN INFORMATION SOLUTIONS, INC.; TRANS UNION LLC; AND EQUIFAX INFORMATION SERVICES, LLC.,<br><br>       Defendant. | Case No. 2:21-CV-03451<br><br>**DEFENDANT NMAC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:    December 13, 2022<br>Time:   10:00 a.m.<br>Crtrm.: 8D |

# Table of Contents

I. INTRODUCTION ...................................................................................... 1

II. FACTUAL BACKGROUND .................................................................... 5

III. LEGAL STANDARDS ........................................................................... 5

IV. GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY
JUDGMENT IN FAVOR OF ARANDA ON HER FCRA CLAIM ...................... 6

   A.  Aranda Never Submitted A Dispute Before Filing This Action. ...................... 6

   B.  Experian Did Not Notify NMAC Of The Alleged Inaccuracies For Which
Aranda Is Suing. ................................................................................................. 7

   C.  Whether NMAC Furnished Inaccurate Information Is Subject To Many
Factual Disputes .................................................................................................. 8

   D. NMAC's Investigation Was Reasonable. ....................................................... 9

   E.  Genuine Disputes Of Material Fact Preclude A Finding Of Willfulness. ....... 11

V. GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY
JUDGMENT IN FAVOR OF ARANDA ON THE ELEMENTS OF HER CLAIM
UNDER THE CCRAA .................................................................................. 13

   A.  Whether NMAC Furnished Inaccurate Information Is Disputed .................... 13

     1.  Aranda Fails To Identify The Particular Information *Furnished By NMAC*
That She Contends Was Inaccurate. ................................................................. 13

     2.  NMAC Accurately Reported That Balances Were Owed On Aranda's Lease
Accounts. .......................................................................................................... 14

     3.  NMAC Accurately Reported The Status Of The Accounts. ......................... 14

     4.  NMAC Did Not Furnish Inaccurate Information Regarding Aranda's
Payments. .......................................................................................................... 15

     5.  Aranda's "Obsolescence" Theory Is Wrong, And Does Not Establish
NMAC's Reporting Was Inaccurate .................................................................. 17

     6.  NMAC's Reporting Could Not Reasonably Have Been Expected To
Adversely Affect Credit Decisions. .................................................................. 20

   B.  Similarly, There Is A Triable Issue Of Fact As To Whether NMAC Should
Have Known It Was Furnishing Inaccurate Information. ..................................... 21

   C.  Many Genuine Disputes Of Material Fact Exist On The Question Of Whether
Plaintiff Suffered Harm. ...................................................................................... 22

D.  Genuine Factual Disputes Exist Regarding Willfulness. .................................24

VI. CONCLUSION ..................................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ambat v. City & County of San Francisco*,
   757 F.3d 1017 (9th Cir. 2014) ............................................................................. 5

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ........................................ 5

*Arriaga v. Logix Fed. Credit Union*,
   2020 WL 8571709 (C.D. Cal. 2020), reconsideration denied, 2021
   WL 4459759 (C.D. Cal. 2021) ............................................................................ 17

*Campbell v. Anniemac Home Mortg.*,
   2017 WL 8180578 (C.D. Cal. 2017) .................................................................. 23

*Celotex Corp. v. Catrett*,
   477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ...................................... 5

*Edwards v. Toys 'R' Us*,
   527 F. Supp. 2d 1197 (C.D. Cal. 2007) ............................................................. 12

*Euring v. Equifax Info. Servs., LLC*,
   2020 WL 1508344 (E.D. Mich. 2020) ............................................................... 16

*Franklin v. Trans Union, LLC*,
   2019 WL 6871254 (C.D. Cal. 2019) ............................................................ 17, 23

*Garrison v. Caliber Home Loans, Inc.*,
   233 F.Supp. 3d 1282 (M.D. Fla. 2017) ............................................................... 8

*Gorman v. Wolpoff & Abramson, LLP*,
   584 F.3d 1147 (9th Cir. 2009) .................................................................... *passim*

*Grigoryan v. Experian Info. Sols., Inc.*,
   84 F. Supp. 3d 1044 (C.D. Cal. 2014) .............................................................. 20

*Guimond v. Trans Union Credit Information Co.*,
   45 F.3d 1329 (9th Cir. 1995) ............................................................................. 12

*Harris v. Nissan-Infiniti LT*,
   2018 WL 2741040 (D. Nev. June 7, 2018) ....................................................... 17

*Holland v. Chase Bank United States, N.A.*,
   475 F. Supp. 3d 272 (S.D.N.Y. 2020) ................................................................. 8

*Johnson v. Wells Fargo Home Mortgage, Inc.*,
   2013 WL 7211905 (C.D. Cal. 2013) .................................................................. 8

*Olson v. Six Rivers Nat'l Bank*,
   111 Cal.App.4th 1, 3 Cal.Rptr.3d 301 (2003) ................................................. 20

*Petras v. Navy Fed. Credit Union*,
   2022 WL 526138 (D. Nev. Feb. 22, 2022) ...................................................... 12

*Prianto v. Experian Info. Sols., Inc.*,
   2014 WL 3381578 (N.D. Cal. 2014) .................................................................. 8

*Seamans v. Temple Univ.*,
   744 F.3d 853 (3d Cir. 2014) ....................................................................... 18, 19

*Westra v. Credit Control of Pinellas*,
   409 F.3d 825 (7th Cir. 2005) ............................................................................. 9

**Statutes**

15 U.S.C. § 1681s-2(a)(5)(A) ...................................................................... 18, 19

15 USC 1681i(a)(2)(A-B) .................................................................................... 7

15 USC § 1681c(a)(4) ....................................................................................... 17

15 USC §1681c(a)(4), (b)(1) .............................................................................. 3

15 USC § 1681c(b)(1) ....................................................................................... 18

FCRA ........................................................................................................ *passim*

N.Y. Pers. Prop. Law §343(4)(c) ..................................................................... 18

**Other Authorities**

Cal. Civil Code §1785.25(a) ............................................................................. 12

# I.  INTRODUCTION

In her "partial" motion for summary judgment, Plaintiff Mayra Aranda ("Aranda" or "Plaintiff") asks this Court to adjudicate in her favor every element of both of her claims against Defendant Nissan Motor Acceptance Company ("NMAC"), including her entitlement to damages, leaving for the jury the issue of the amount of damages she should be awarded.  She contends that there is no genuine issue of material fact on any of these elements of her claims.

As set forth below, however, Aranda's motion is based upon a one-sided and incomplete recitation of the evidence in this lawsuit.  With the exception of a few basic elements of her claims, such as the fact that NMAC is a "furnisher," the elements of her claims against NMAC are hotly contested.  The evidence she cites to support many of the supposedly undisputed material facts does not in fact establish those facts.  And Aranda simply ignores all of the countervailing evidence that shows there are numerous factual disputes that would have to be resolved at trial if this lawsuit survives NMAC's pending motion for summary judgment.

As to Aranda's claim for violation of the Fair Credit Reporting Act or "FCRA," she never submitted a dispute to any consumer reporting agency or "CRA" prior to filing this lawsuit.  Her FCRA claim fails for this threshold reason, as explained in NMAC's pending cross-motion for summary judgment.  Two of the three CRAs sued in this case never sent an ACDV to NMAC, for the obvious reason that her lawsuit was not and could not be the "dispute" required under the FCRA.

Even with respect to the one CRA that did send an ACDV, NMAC was never told of the information that Aranda now contends was inaccurate.  It was only informed that Aranda contended she was "PAID IN FULL" and "DID NOT OWE ON ANY LEASE."  Experian did not attach a copy of the complaint, which is required to trigger the furnisher's reinvestigation obligations under the FCRA. NMAC adequately and properly responded to this purported "dispute" from Experian by confirming that Aranda still owed money on her account, as it is

1  undisputed that Aranda has never paid any portion of the $9,019 in unpaid end of

2  lease charges on that account.

3      Nor is it undisputed that NMAC's investigation of this "dispute" was willfully

4  inadequate.  NMAC deleted two of the three accounts, which Aranda concedes was

5  done "correctly," and it confirmed that Aranda owed money on the remaining

6  account, thus undercutting her contention that NMAC willfully disregarded its

7  obligations under the FCRA.

8      The critical elements of Aranda's claim for violation of the California

9  Consumer Credit Reporting Agencies Act ("CCRAA") are controverted as well.

10      As explained below, and in NMAC's Statement of Genuine Disputes

11  ("SGD") submitted in response to this motion, and as shown by the evidence that

12  NMAC submits with this opposition, whether NMAC furnished inaccurate

13  information on these accounts is hotly contested.[1]

14      The balances reported by NMAC were (and are) in fact still owed by Aranda,

15  notwithstanding her contention that they somehow disappeared due to the passage of

16  time.  The accounts were not closed because of the unpaid balances, and  NMAC

17  was not obligated to reported them as such.  The accounts were open and Aranda

18  has presented no evidence that the status of her accounts was inaccurately reported.

19      Nor did NMAC furnish inaccurate information regarding payments on the

20  accounts.  The April 15, 2021 Funding Suite credit report at issue clearly showed

21  that monthly payments were no longer being made.  The credit report at issue

22  showed the date each account was opened (2007 or 2011); the 39 month term of the

[1] The SGD responds to each of Plaintiff's 167 facts listed in her SUF.  When this brief refers to an SDG number, it refers the Court to NMAC's dispute and responsive evidence.  This brief also refers to NMAC'S Additional Material Facts ("AMF"), which are found at the end of the SGD document, with the evidence supporting those facts.

account; the date of last payment (8-10 years earlier); and, even an explicit comment that "**Entire Payment Schedule Completed** For Terms Of Agreement."

While the credit reports also included a payment amount—which the CRAs all characterized differently—courts have long recognized that the scheduled monthly payment amount is historical information that is properly furnished even if an account that has come to an end. While Aranda *argues* that her credit report "gave the impression" that payments were still being made, because that is how her loan officer interpreted the report, this one-sided argument ignores all of NMAC's contrary evidence and impermissibly adopts inferences that favor the moving party on this summary judgment motion.

Further, as Aranda concedes and as the Ninth Circuit has held, credit reporting cannot be deemed inaccurate unless it is reasonably expected to adversely affect credit decisions. *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009). Here, NMAC modified its credit reporting policy in 2016 in a manner to make it *more favorable* to consumers, and that also had the benefit of complying with state law prohibiting derogatory reporting on leases based upon the failure to pay end of lease charges. Even Aranda's credit reporting expert concedes that this change benefitted Aranda by increasing her credit score.

Aranda's argument that she was nevertheless harmed because the lease accounts would not have been included on the Funding Suite credit report, and she then could have obtained a mortgage in April 2021, is based upon her misreading of the FCRA. Since Aranda was applying for a mortgage greater than $150,000, derogatory accounts could be included on her credit report regardless of the age of those accounts. 15 USC §1681c(a)(4), (b)(1). Further, since NMAC was not reporting any derogatory information about Plaintiff's accounts, it was not obligated to provide a date of first delinquency under the plain language of the FCRA.

For these same reasons, and based upon the same countervailing evidence that Aranda ignores, there is a genuine dispute of material as to whether any of the

supposed inaccuracies in her credit reporting were "willful."  NMAC not only furnished information that was accurate, it furnished information that was more beneficial to consumers than what Aranda now contends should have been reported. There is simply no evidence to support Aranda's suggestion that NMAC intentionally furnished inaccurate information to "circumvent applicable time limitations" and cause these accounts to remain on her credit report for longer. Plaintiff's Motion for Summary Judgment, Dkt #102-1 ("MSJ"), 24:21-24.  And certainly there is no uncontroverted evidence of willfulness.

Finally, Plaintiff is also wrong in arguing that it is undisputed that she has been harmed by NMAC's actions.  Aranda's claim that NMAC's reporting kept her from being approved for a mortgage is particularly brazen.  As demonstrated by the body of evidence produced in this case, which Aranda studiously ignores in her motion, Aranda's loan officer, Sandra Toledo—who is also the Plaintiff's sister— simply misread her credit report.  She submitted a request for a mortgage preapproval that wrongly characterized her old Nissan lease accounts as current payment obligations, when they obviously were not, and despite having been specifically advised by the Arandas that they were *not* making payments on those old accounts.  Toledo failed to follow the standard industry practice of excluding those accounts from their debt-to-income ("DTI") calculation or ordering a credit supplement to clarify any ambiguity she thought existed.

Further, Toledo drastically understated the Arandas' income, which overstated their DTI and caused their request for a preapproval to be denied.  Had Toledo properly calculated their income and submitted an accurate loan application, they would have been preapproved for a mortgage, both in April 2021 and certainly two months later, when two of the three accounts had been removed from Plaintiff's credit report.

Aranda's motion even ignores the fact that the Arandas *were* approved for a mortgage.  This happened in October 2020, when Rocket Mortgage correctly

calculated their income and determined that their DTI was sufficient to qualify them for a mortgage.  Mayra Aranda claims that she did not learn they had been approved for a mortgage until nearly two years later, because her husband Sergio, who handles the family's finances, never told her.  For that reason and others, her contention that she suffered significant emotional distress because of the April 2021 denial will be disputed should this case survive to trial.

For all of these reasons, explained in more detail below, Plaintiff's motion for partial summary judgment should be denied, and the Court should instead grant NMAC's cross-motion for summary judgment.

## II.  FACTUAL BACKGROUND

The factual background of this case has been extensively briefed in the parties' cross-motions for summary judgment, including in NMAC's pending motion for summary judgment.  NMAC will not repeat that background here, so as to avoid burdening the Court with duplicative briefing.  However, it will provide additional factual information below where it is relevant to the particular element on which Aranda contends there is no genuine dispute of fact.

## III.  LEGAL STANDARDS

In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  "The evidence of the non-movant *is to be believed, and all justifiable inferences are to be drawn in his favor*."  Anderson, 477 US at 255, 106 S.Ct. at 2513 (emphasis added).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  "Rule 56[ (a) ] mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of

1  an element essential to that party's case, and on which that party will bear the

2  burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

3      Because summary judgment is a "drastic device," cutting off a party's right to

4  present its case to a jury, the moving party bears a "heavy burden" of demonstrating

5  the absence of any triable issue of material fact. *Ambat v. City & County of San*

6  *Francisco*, 757 F.3d 1017, 1031 (9th Cir. 2014).

7  **IV.  GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY**
   **JUDGMENT IN FAVOR OF ARANDA ON HER FCRA CLAIM**

8

9      NMAC agrees with Aranda that, in order to prevail on her FCRA claim, she

10  must establish the following elements:  (1) NMAC is a furnisher; (2) Aranda

11  notified the CRAs of her dispute; (3) the CRAs notified NMAC of the inaccurate

12  information being disputed; (4) the information furnished by NMAC was in fact

13  inaccurate; and, (5) NMAC failed to conduct the reasonable investigation required

14  by the statute.  MSJ, 9:21-27 (citing *Robbins v. City Mortgage, Inc.*, No. 16-CV-

15  04732-LHK, 2017 WL6513662, at *5 (N.D. Cal. Dec. 20, 2027)).

16      NMAC concedes it is a furnisher, but all other elements of Aranda's FCRA

17  claim are disputed.

18  **A.      Aranda Never Submitted A Dispute Before Filing This Action.**

19      As NMAC explained in its motion for summary judgment, Aranda's FCRA

20  claim fails because she never submitted a dispute of any allegedly inaccurate

21  information to the CRAs before filing this lawsuit.  Aranda's motion confirms that

22  her theory is that the filing of her lawsuit and the service of her complaint on the

23  three CRAs constitutes the "dispute" required under the FCRA.  MSJ, 13:24-14:7.

24      In an effort to bolster her novel position, Aranda now points out that one of

25  the three CRAs, Experian, appears to have treated her complaint as a dispute

26  because it sent an ACDV to NMAC.  MSJ, 14:2-4.

27      But Plaintiff's theory proves too much.  Two of the three CRAs ***did not*** send

28  an ACDV to NMAC upon receipt of the complaint.  By Plaintiff's logic, this

"proves" that the filing of her lawsuit is not a dispute that triggers the reinvestigation obligation under the FCRA. For all of the factual and legal reasons set forth in NMAC's motion for summary judgment, Dkt #103, 9:6-15; 17:3-19:10, which are incorporated herein by reference, Aranda fails to make this threshold showing of having submitted a dispute and her FCRA claim fails for that reason alone.

**B.    Experian Did Not Notify NMAC Of The Alleged Inaccuracies For Which Aranda Is Suing.**

NMAC also agrees with Aranda that a furnisher's reinvestigation duties are only triggered upon receipt of notice of a consumer dispute from the CRAs. MSJ, 13:18-19. Beyond that, the scope of those duties are defined by the information contained in the ACDV; that is, a furnisher is *only* obligated to investigate the inaccuracies specified in the ACDV. *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 (9th Cir. 2009) (furnisher's investigation judged only "in light of what it learned about the nature of the dispute from the description in the CRA's notice of dispute."); Ulzheimer Decl., ¶21. And, the CRA is obligated to send to the furnisher any documentation of the dispute that was provided by the consumer, to allow for a complete investigation by the furnisher. 15 USC 1681i(a)(2)(A-B); *Gorman*, 584 F.3d at 1157.

In this case, Experian provided the following explanation of Aranda's dispute:

"ACCT INVOLVED IN LITIGATION

CONS CLAIMS PAID IN FULL DOES NOT OWE ON ANY LEASE"

See Plaintiff's Statement of Allegedly Uncontroverted Facts ("SUF"), No. 53 and evidence cited therein. Experian's interpretation of the complaint ("dispute") was simply that Aranda claimed she did not owe NMAC any money. This is consistent with the allegations in Plaintiff's complaint. *See* Dkt #1, ¶¶ 23, 30.

Critically, Experian's ACDV did not inform NMAC of the other supposed inaccuracies for which Aranda is now suing, such as her claim that NMAC's reporting gave the "impression" that the accounts were still open and monthly

payments were being made.  And Experian failed to satisfy its obligation under the FCRA to provide the complaint itself, which identifies other supposed inaccuracies. As a result, NMAC had no legal obligation to investigate and correct these other alleged inaccuracies for which it is now being sued.  This evidence creates a genuine dispute of material fact whether NMAC was provided with notification from Experian sufficient to trigger any reinvestigation obligations under the FCRA. As discussed below, it also establishes the reasonableness of NMAC's investigation into the dispute.

**C.    Whether NMAC Furnished Inaccurate Information Is Subject To Many Factual Disputes.**

Aranda argues that the FCRA and the CCRAA have virtually identical tests for whether information is "inaccurate."  MSJ, 21:2-4; see also 10:2-6.  NMAC addresses the accuracy element below, in conjunction with Plaintiff's CCRAA claim.  As discussed at pages 13-21, NMAC furnished accurate information to the CRAs, and it defies logic to say there are no factual disputes on that issue.

With respect to Aranda's FCRA claim, it is significant that the ***only*** dispute ever forwarded to NMAC (and by only one of the three CRAs) is that Aranda claimed she "[DID] NOT OWE" NMAC money.  It cannot reasonably be disputed that Aranda ***did*** owe NMAC money.[2]  In this very motion Aranda goes to great

---

[2] Aranda never explains in her motion why she contends she no longer owed NMAC money, nor did she present any evidence on this point.  But she has suggested that the debt no longer exists because the statute of limitations has run on any action by NMAC to collect the end of lease charges.

This legal theory is simply wrong.  A debt is *not* extinguished when the statute of limitation runs, the creditor simply becomes unable to obtain a judgment for the amount owed.  *See Holland v. Chase Bank United States, N.A.*, 475 F. Supp. 3d 272, 277 (S.D.N.Y. 2020) (that the statute of limitations on a debt has expired does not make reporting that debt inaccurate); *Garrison v. Caliber Home Loans, Inc.*, 233 F.Supp. 3d 1282, 1293 (M.D. Fla. 2017) (furnisher did not violate FCRA by reporting unpaid balance that had become uncollectible due to the statute of limitations; *see also Johnson v. Wells Fargo Home Mortgage, Inc*., 2013 WL 7211905, at *7 (C.D. Cal. 2013) (holding that furnisher cannot be liable for

1 lengths to show that she had $9,019.58 in unpaid end of lease charges on the

2 account in question (x7100) and never made any payments to NMAC on that unpaid

3 balance.  MSJ, 5:7-14, citing Plaintiff's SUF No. 140.  Thus, the only information

4 identified in the ACDV as being inaccurate was in fact correct.

5 **D.      NMAC's Investigation Was Reasonable.**

6        While NMAC is confident that the evidence shows its investigation of

7 Aranda's accounts was reasonable, "summary judgment is generally an

8 inappropriate way to decide questions of reasonableness because 'the jury's unique

9 competence in applying the 'reasonable man' standard is thought ordinarily to

10 preclude summary judgment.'"  *Gorman*, 584 F.3d at 1157.  This principle applies

11 to disputes over the reasonableness of reinvestigations required under the FCRA.

12 *Id.*; *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005)

13 ("Whether a defendant's investigation [pursuant to § 1681s–2(b)(1)(A)] is

14 reasonable is a factual question normally reserved for trial.").

15        Aranda's argument that this issue can be summarily adjudicated in her favor

16 fails for another reason as well.  Aranda cites evidence and makes arguments about

17 NMAC's failure to investigate other inaccuracies that were not specified in

18 Experian's ACDV.  As just explained in the preceding section, furnishers are *only*

19 obligated to investigate those disputes specified in ACDVs.  *Gorman*, 584 F.3d at

20 1157 ("The pertinent question is thus whether the furnisher's procedures were

21 reasonable *in light of what it learned about the nature of the dispute from the*

22 *description in the CRA's notice of dispute*.") (emphasis added).

23        But Aranda's motion relies on evidence that, she contends, shows NMAC

24 failed to recognize that the accounts should have been reported as derogatory, were

25 giving the false impression that payments were being made, etc.  But whether

26 _____

27 reporting the balance of second mortgage even though collection barred by anti-
deficiency statute); *Prianto v. Experian Info. Sols., Inc.*, 2014 WL 3381578, at *5
28 (N.D. Cal. 2014).

NMAC's investigation was reasonable depends on how it responded to the dispute specified in the ACDV—which was over whether Aranda owed NMAC money. NMAC's review of its records confirmed that money was still owed on x7100, so its investigation was reasonable when properly measured against the ACDV.

NMAC's investigation cannot be held unreasonable based on its supposed failure to identify and correct other alleged inaccuracies that were set forth in Aranda's complaint but not included in the ACDV.  As the Ninth Circuit explains:

> In a notice of dispute received May 13, 2004, TransUnion provided the following information concerning Gorman's MBNA account: "Claims company will change. Verify all account information." The notice provided no further information about the nature of the dispute. In response to this notice, MBNA "review[ed] the account notes to determine whether MBNA had agreed to delete any charges or to modify the account information in any way." It concluded that "[n]o such commitment had been made." MBNA's review of the account information provided by TransUnion did reveal "some minor differences." As a result, MBNA submitted updated address, date of birth, and account delinquency information to TransUnion.
>
> The cursory notation, "[c]laims company will change," provided no suggestion of the nature of Gorman's dispute with Four Peaks. We conclude therefore that a jury could not find MBNA's response unreasonable. MBNA reasonably read the vague notice as indicating that MBNA had previously agreed to change certain account information. MBNA's review of its internal account files to determine whether any such agreement had been reached was all that was required to respond reasonably to this notice of dispute. The account notes reveal that MBNA had communicated with Four Peaks several times and do not reveal any agreement by MBNA to credit those charges, or any others. MBNA could not have reasonably been expected to undertake a more thorough investigation of the Four Peaks incident based on the scant information contained in this notice.

*Gorman*, 584 F.3d at 1157–58.[3]  Any suggestion NMAC should have done more is, at best, a fact issue for trial.

While Aranda argues that NMAC's investigation was inherently unreasonable because it only reviewed information in its own computer systems, nothing more was needed based on the cursory "dispute" it received, SGD No. 52-53, AMF No. 2, and the Ninth Circuit has rejected the notion that "it is per se unreasonable for a furnisher to rely solely on internal account records when investigating a consumer dispute." *Gorman*, 584 F.3d at 1160. Aranda's argument that NMAC failed to adequately investigate inaccuracies not specified in the ACDV is simply irrelevant.

**E.     Genuine Disputes Of Material Fact Preclude A Finding Of Willfulness.**

Aranda even goes so far as to argue that there is no dispute of material fact but that NMAC's supposed failure to comply with its reinvestigation obligations was "willful," which would entitle her to recover statutory penalties under the FCRA.  According to her motion, the employee who investigated the one account not removed from her credit report (x7100) was not competent, could not speak or read English well enough, was not paid enough, and did not look closely enough at her dispute, such that NMAC's hiring of and reliance on this employee was "in reckless disregard of its statutory duties" under the FCRA.  See MSJ, pages 14-19. This argument fails for multiple reasons.

First, Aranda's attack on the competence of this employee is based upon a selective citation—and, in some instances, misconstruction—of his deposition testimony.  As detailed in NMAC's SGD, the evidence cited in Aranda's SUF fails to support many of these characterizations, and other evidence supports a finding

---

[3] An investigation need not be perfect in order to be reasonable.  "We emphasize that the requirement that furnishers investigate consumer disputes is procedural. An investigation is not necessarily unreasonable because it results in a substantive conclusion unfavorable to the consumer, even if that conclusion turns out to be inaccurate." *Gorman*, 584 F.3d at 1161.

1  that he was properly trained and competent to fulfill the job for which he was hired.

2  SGD, Nos. 60, 66, 69-70; AMF Nos. 6-11.

3       Second, as shown in Section IV(B) above, the only "dispute" forwarded to

4  NMAC was that Aranda claimed she did not owe NMAC money.  The ACDV did

5  not complain that NMAC's reporting "gave the impression" monthly payments were

6  being made, or assert that the accounts should have been reported as derogatory.

7  Contrary to Aranda's argument, an extensive investigation into NMAC's systems of

8  record was not required to confirm that there was still an outstanding balance on

9  account x7100 and that she had not made any payments on that $9,019.58 balance

10 since the lease was terminated.  Essentially, Aranda is arguing that NMAC's

11 employee was incompetent because he failed to investigate other inaccuracies that

12 were not included in the ACDV received from Experian.

13      Whether or not a furnisher acted willfully or in reckless disregard of its duties

14 under the FCRA is inherently a factual question on which NMAC would be entitled

15 to present its evidence to the jury.  *Guimond v. Trans Union Credit Information Co.*,

16 45 F.3d 1329, 1333 (9th Cir. 1995) ("The reasonableness of the procedures and

17 whether the agency followed them will be jury questions in the overwhelming

18 majority of cases"); *Edwards v. Toys 'R' Us*, 527 F. Supp. 2d 1197, 1210 (C.D. Cal.

19 2007) ("Willfulness under the FCRA is generally a question of fact for the jury");

20 *Petras v. Navy Fed. Credit Union*, 2022 WL 526138, at *6 (D. Nev. Feb. 22, 2022)

21 ("Courts routinely find that the question of willfulness turns on factual

22 determinations best left for a jury.")

23      The evidence NMAC would present would include the truncated description

24 of Aranda's dispute; the fact that it deleted two of the three lease accounts identified

25 in the ACDV sent by Experian, which Aranda concedes was "correctly" done, see

26 First Amended Complaint, Dkt #64, ¶58; and, the evidence in its system of record

27 showing that Aranda in fact owed money on the remaining account.

28

Genuine disputes of material fact preclude entry of summary judgment in favor of Aranda on willfulness, just as they preclude summary judgment on the other elements of her FCRA claim.

## V. GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT IN FAVOR OF ARANDA ON THE ELEMENTS OF HER CLAIM UNDER THE CCRAA

Aranda's other claim is that NMAC violated Cal. Civil Code section 1785.25(a), part of the CCRAA.  NMAC agrees that the elements of this claim are as described by Aranda on page 19 of her motion: (1) NMAC is a "person" as defined under the CCRAA; (2) NMAC furnishes information to the CRAs; (3) as to the Plaintiff, NMAC furnished information that was inaccurate; (4) Plaintiff was harmed as a result of the furnishing of inaccurate information; and, (5) NMAC knew or should have known that the information it furnished was inaccurate.  MSJ, 19:22-27 (citing *Robbins*, 2017 US District LEXIS 209367 at *39.)

NMAC admits that it is a "person" subject to the CCRAA.  It also admits that it furnishes information to the CRAs, *generally*—but see below concerning Plaintiff's lack of evidence concerning what and when NMAC furnished as to these accounts.  As to the other elements of her claim under the CCRAA, however, there are genuine disputed issues of material fact that preclude entry of summary judgment in Aranda's favor.

## A.    Whether NMAC Furnished Inaccurate Information Is Disputed.

### 1.    Aranda Fails To Identify The Particular Information *Furnished By NMAC* That She Contends Was Inaccurate.

Since Aranda is contending that NMAC furnished inaccurate information to the CRAs, it is incumbent upon her to present evidence of precisely what information was being furnished by NMAC, and when.  She stumbles at this very first step.  She first introduces deposition testimony by NMAC employee Deborah Donley as to the status of Aranda's accounts at the time of her deposition in April 2022.  Then, as "proof" of what information NMAC was furnishing to the CRAs

over the actual time period at issue (April 2019 to April 2021), Aranda relies upon credit reports prepared by the CRAs on April 15, 2021.  What she does *not* provide is any evidence of what data NMAC actually furnished to the CRAs.

This is more than a mere technicality.  The evidence is undisputed—and even Aranda's credit reporting expert concedes—that the CRAs present information differently, and there are frequently variations in the way in which the CRAs describe the same data furnished by a creditor.  AMF No. 16; Donley Depo, 96:8-21; 150:20-151:2; Hendricks Depo, 53:-13, 58:18-59:1, 77:17-78:8; Ulzheimer Decl., ¶¶4-7.

Since Aranda's lawsuit turns on the accuracy *of the information that NMAC furnished*—not the accuracy of the information the CRAs compiled in their credit reports—it is critical that plaintiff produce evidence of exactly what information was furnished by NMAC.  Evidence of how the CRAs described the accounts in their credit reports does not suffice.  As will be shown below, Aranda's reliance on the CRAs' credit reports and her failure to provide evidence of the actual data NMAC furnished is fatal to her accuracy argument.

**2.  NMAC Accurately Reported That Balances Were Owed On Aranda's Lease Accounts.**

One inaccuracy alleged by Aranda (and the only one identified in Experian's ACDV) is that it was inaccurate for NMAC to report to the CRAs that balances were owed on each of her three lease accounts.  NMAC did furnish the account balances to the CRAs.  As already explained at pages 8-9 above, however, balances *were* owed on each of those accounts, because Aranda had substantial end of lease charges for which she has never paid.  Thus, the evidence does not support her contention that this aspect of NMAC's reporting was inaccurate.

**3.  NMAC Accurately Reported The Status Of The Accounts.**

Aranda also complains that the way the lease accounts appeared on Aranda's credit reports "gave the (wrong) impression" that they remained  open.  MSJ, 7:26-

8:1; 22:11-14.  The only evidence she cites is an April 15, 2021 credit report prepared by "Funding Suite" and her loan officer's/sister's interpretation of that credit report to mean that the lease accounts were still open.  SUF, Nos. 151-153 and evidence cited therein.

To begin with, NMAC never furnished data to Funding Suite and the credit report it prepared is even further removed from the actual data that was furnished by NMAC.[4]  Nor does that report describe the accounts as "open" in any event. "Open" was Toledo's interpretation of the information found in the report.

What NMAC reported was that the accounts were current and in good standing.  AMF, No. 19.  It did not report these accounts as "closed" because that designation is reserved for accounts that have been paid in full, transferred, or sold, and Aranda's accounts were never paid in full, transferred or sold.  AMF, Nos. 20-21.  Thus the accounts were in fact still open, because substantial unpaid end of lease charges remained on each account.  AMF, No. 18; Donley Depo, 125:19-23.  Thus there is nothing inaccurate or misleading about the status of these accounts as reflected on the April 15, 2021 credit report at issue.

### 4.   NMAC Did Not Furnish Inaccurate Information Regarding Aranda's Payments.

Aranda's chief complaint seems to be that the information furnished by NMAC was inaccurate because it also "gave the impression" that she was making monthly payments on the three leases totaling $1,903.00.  MSJ 7:26-8:1; 11:23-26

Again, however, she presents no evidence as to what information was furnished by NMAC.  Instead, she relies only on information found in the April 15,

---

[4] Funding Suite is not one of the three major CRAs to which NMAC furnishes data. It is, instead, a "reseller," which is a company that obtains credit reports from the three major CRAs and then combines or "merges" those data into a single report and sells its "tri-merge" report to prospective creditors.  Ulzheimer Decl., ¶7. NMAC has never furnished any data to Funding Suite.  Donley Decl., ¶19.

**15**
**DEFENDANT NMAC'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

2021 credit reports prepared by Funding Suite and the three major CRAs, which is insufficient to carry her burden, on this motion or in this case.  SUF, Nos. 55-56, 141-148, 152.

Those third party credit reports do not prove Plaintiff's claim that NMAC furnished inaccurate information suggesting she was still making payments on her leases.  To the contrary, the information found in those credit reports clearly shows that Aranda's lease payments had ended.  Such information included (1) the date the lease account was opened (in 2007 or 2011); (2) the fact that the term of each lease was only 39 months; and, (3) the date of Aranda's last payment on the account, which was in February 2011 or August 2013, according to the date of last activity shown on the credit reports.  AMF, Nos. 23-25.  That information could not reasonably be read to mean she was still making monthly payments 8-10 years later.

And for good measure, NMAC also furnished a "special comment code" that the credit reporting industry uses only for leases that have terminated after all scheduled payments have been made.  Because of this comment code NMAC furnished to the CRAs, they each stated the following on their credit reports: "**Lease-Full Termination/Entire Payment Schedule Completed For Terms Of Agreement**."  AMF, No. 24 (emphasis added).

The CRAs also included a payment amount on their credit reports, but each of them characterized this amount differently.  While Experian called this amount a "monthly payment," Equifax described it as the "scheduled payment amount." Trans Union interpreted the data NMAC furnished to mean that Aranda had paid "$652 dollars per month, paid Monthly for 39 months."  And Funding Suite called this amount, simply, "Payment."  Again, the CRAs provided different interpretations of the information furnished by NMAC, and Aranda does not present the requisite evidence that NMAC furnished inaccurate data.

However the CRAs chose to characterize this amount, there is nothing unusual about stating the scheduled monthly payment for an account on a credit

report, whether the account is open or closed.  Courts have repeatedly rejected Aranda's argument that providing historical information regarding the payment amount renders reporting inaccurate.  *Euring v. Equifax Info. Servs., LLC*, 2020 WL 1508344, at *5 (E.D. Mich. 2020) ("there is nothing false or materially misleading about the 'Monthly Payment' information on plaintiff's credit reports in light of the other information that appears on those reports . . . the 'Monthly Payment' information is not inaccurate as it stands because the amounts refer to when the accounts were open, similar to how the 'Highest Balance' information applied only when the accounts were open"); *Franklin v. Trans Union, LLC*, 2019 WL 6871254, at *3 (C.D. Cal. 2019); *Harris v. Nissan-Infiniti LT*, 2018 WL 2741040, at *4 (D. Nev. June 7, 2018).

Here, Aranda's accounts were more than a decade old, her last payments had been made many years earlier, and NMAC specifically reported "Entire Payment Schedule Completed" on each lease.  The only reasonable interpretation was that these were historical payment amounts.  Plaintiff's loan officer/sister simply misread her credit reports.  AMF, No. 26; Ulzheimer Declaration, ¶¶9-11, 20; Droske Declaration, ¶¶4.a.-4.c.  When multiple facts reported about an account need to be interpreted in order to determine whether the credit reporting as a whole was misleading, summary judgment is inappropriate because there is a genuine issue of material fact for a jury.  *Arriaga v. Logix Fed. Credit Union*, 2020 WL 8571709, at *3 (C.D. Cal. 2020), reconsideration denied, 2021 WL 4459759 (C.D. Cal. 2021).

**5.    Aranda's "Obsolescence" Theory Is Wrong, And Does Not Establish NMAC's Reporting Was Inaccurate.**

Aranda also makes a series of legal arguments in her quest to prove that NMAC's reporting was indisputably inaccurate.  She makes the counterintuitive argument that NMAC *should have* designated her accounts as derogatory, which she says then would have required NMAC to stop furnishing information on the

accounts seven years after they terminated.  MSJ, 10:24-11:10.  This argument is both legally incorrect and factually unsupported.

First, the FCRA provision relied Aranda relies upon, 15 USC § 1681c(a)(4), is inapplicable to NMAC, on its face.  That requirement applies only to CRAs, not furnishers.  Furnishers like NMAC have no obligation to stop furnishing information at any particular point in time, whether an account is considered derogatory or not, as Aranda and her credit reporting expert concede.  MSJ, 10:25-11:2; Hendricks Depo, 130:5-131:7; Ulzheimer Decl., ¶20 and Ex. B (Rebuttal at pp. 2-3).

Second, that statute has no application to Aranda's case at all.  It is generally true that 1681c(a)(4) precludes CRAs from including derogatory accounts in their credit reports after seven years.  However, there is an exemption to this requirement where the credit report is being provided in connection with a loan for $150,000 or more.  15 USC § 1681c(b)(1).  The credit report at issue in this case was used for a $650,000 mortgage application.  SGD, No. 154; AMF, No. 34.  So, even if her lease accounts had been reported as derogatory, as Aranda now wishes would have occurred, the CRAs could still have included those accounts on the credit report they provided to her mortgage lender.

Third, the parties dispute whether the lease accounts should have been as derogatory.  Aranda's leases were terminated without her vehicle being repossessed or her account charged off.  At the end of her lease term she had certain end of lease charges unpaid.  While NMAC's past policy was to charge off these amounts and report the account as derogatory, in some states vehicle lessors are precluded from treating or reporting an account as derogatory in that situation.  N.Y. Pers. Prop. Law §343(4)(c).  So, since 2016, NMAC has designated her accounts as current and in good standing rather than charged-off.

Plaintiff's theory that a date of first delinquency had to have been reported in this situation is wrong, and is contrary to the text of the statute she relies upon.

Under the FCRA, the requirement to provide a date of first delinquency *only* applies when the creditor is reporting that the account as derogatory:

> A person who furnishes information to a consumer reporting agency regarding a delinquent account being placed for collection, charged to profit or loss, or subjected to any similar action shall, not later than 90 days after furnishing the information, notify the agency of the date of delinquency on the account, which shall be the month and year of the commencement of the delinquency on the account that immediately preceded the action.

15 U.S.C. § 1681s-2(a)(5)(A).

For this reason, Aranda's citation to the *Seamans* case is inapposite and misleading. In that case, the defendant university reported extremely negative credit information about a student who had taken out a loan in 1991 but failed to repay it, including that the student "had been over 180 days late for at least twenty-four (24) months prior to the time the Perkins [L]oan was paid in full." *Seamans v. Temple Univ.*, 744 F.3d 853, 857 (3d Cir. 2014). Even after the plaintiff finally paid off the loan in 2011, some 20 years later, and the loan's status was changed to "paid," the university continued to report the plaintiff as past due.

Further, the university had a specific policy of not providing a date of first delinquency on accounts that it was reporting as derogatory in order to ensure that negative information stayed on borrowers' credit reports as a collection tool. *Id*. at 859-861. Not surprisingly, given these facts, the Third Circuit found that the information furnished "may have been incomplete and inaccurate" and held that the matter had to go to the jury. *Id*. at 866.

*Seamans* is thus easily distinguishable from this case. Unlike NMAC, the defendant furnisher in that case was both reporting negative information and not providing a date of first delinquency that could be used to remove that information from the plaintiff's credit report when legally required. But NMAC has reported

*positive* information on Aranda since 2016, so the statute she relies upon (15 U.S.C. § 1681-2(a)(5)(A)) and the *Seamans* case are both inapplicable.[5]

In summary, Aranda's legal arguments about obsolescence are based on a misreading of the statutory requirements; they do not advance her contention that NMAC's reporting was inaccurate, and certainly do not establish that there is no triable issue of fact on this issue.

### 6. NMAC's Reporting Could Not Reasonably Have Been Expected To Adversely Affect Credit Decisions.

Finally, Aranda concedes, as she must, that information a furnisher provides to the CRAs cannot be deemed inaccurate unless it could reasonably be expected to adversely affect credit decisions concerning the consumer.  MSJ, 10:14-20 (citing *Gorman*, 584 F.3d at 1163-64).  This requirement applies to claims of inaccuracy under both the FCRA and CCRAA because courts apply the same accuracy standards under each statute.  *Grigoryan v. Experian Info. Sols., Inc.*, 84 F. Supp. 3d 1044, 1061 (C.D. Cal. 2014); *Olson v. Six Rivers Nat'l Bank*, 111 Cal.App.4th 1, 3 Cal.Rptr.3d 301, 309 (2003) (internal citations omitted).

Aranda presents no evidence that NMAC should have had such an expectation in this case.  She argues that, since her NMAC accounts could not have been included on her April 2021 credit report if they had been deemed derogatory— which, as just explained, is incorrect—NMAC should have expected its "objectively inaccurate" reporting to have harmed Aranda.

---

[5] In fact, *Seamans* supports NMAC's position in this case.  That court explained that the FRCA "reflects a policy choice to allow dated adverse credit data to 'age off' a credit report because such information might otherwise indefinitely hamper the borrowing capabilities of now-reformed individuals."  But it held that "**non-adverse credit information, by contrast, can be reported indefinitely—at least in part because it demonstrates that a person has been a reliable borrower in the past and will presumably continue to be such in the future**."  *Id.*, at 863 (emphasis added).

Since 2016, NMAC has reported only "non-adverse credit information" about Aranda.

To the contrary, NMAC's change in its credit reporting policies was reasonably expected to *benefit* consumers, and in fact they had that effect. By eliminating charge-off designations for unpaid end of lease charges, NMAC prevented customers from having serious derogatory marks on their credit, which would reasonably be expected to *increase* their credit scores. AMF, No. 35. Aranda's own credit reporting expert concedes the point. Hendricks Depo 106:20-107:1, 118:5-122:16; see also Ulzheimer Declaration, ¶18 and Ex. A (Report at pp. 14-15).

Aranda herself benefitted by enjoying a much higher credit score than she would have had if these accounts were designated as seriously derogatory (which is likely why she cancelled her Credit Karma dispute of the Nissan Infiniti lease account in June 2017). After NMAC changed its credit reporting policy to eliminate derogatory reporting for unpaid end of lease charges, Aranda was able to get approved for *seven* additional credit cards between June 2016 and August 2019. AMF, No. 36 (see Plaintiff's September 6, 2019 Trans Union credit report). At a minimum, there is a genuine dispute of material fact as to whether there was a reasonable expectation of an adverse impact from this policy.

**B.  Similarly, There Is A Triable Issue Of Fact As To Whether NMAC Should Have Known It Was Furnishing Inaccurate Information.**

For all of the same reasons just discussed, NMAC disputes that it knew or should have known that it was furnishing inaccurate information. NMAC believes and maintains that the information it furnished on Aranda's lease accounts was accurate, and it intends to present the evidence summarized above at trial to support its position. Genuine disputes of material fact prevent entry of summary judgment in Plaintiff's favor on this element as well.

**C.     Many Genuine Disputes Of Material Fact Exist On The Question Of Whether Plaintiff Suffered Harm.**

Aranda makes two arguments to prove that she was irrefutably harmed by NMAC's reporting, neither of which has merit.

First, she claims the uncontroverted evidence shows that she and her husband were prevented from obtaining a mortgage because their debt-to-income ("DTI") ratio was too high to qualify when they applied in April of 2021.  MSJ, 22:4-24.  The evidence she relies upon consists of her sister Sandra Toledo's testimony, the April 15, 2021 Funding Suite credit report that Toledo misread, and a computerized printout showing that the loan application submitted by Toledo was declined by an automated underwriting system.  SUF, Nos. 151-157, 161 and evidence cited therein.

But discovery in this case produced ample evidence that the information concerning the lease accounts contained in the Funding Suite credit report did ***not*** prevent her from obtaining a mortgage.  Aranda simply ignores that evidence in this motion.  That evidence includes at least the following:

(1)     The information contained in the Funding Suite credit report clearly showed that monthly payments were no longer being made in April 2021, as explained at pages 15-17 above.

(2)     No competent loan officer would or should have included the scheduled payment amounts on these old Nissan leases in the DTI calculation, especially since Toledo was specifically told by her brother in law that Aranda was no longer making payments on these accounts.  AMF, Nos. 26, 37.

(3)     Toledo failed to order a credit supplement or take any of the other steps a reasonably prudent loan officer would have taken to confirm that the NMAC accounts should not have been used in computing their DTI for their loan application.  AMF, Nos. 38-39.

1      (4)     Toledo drastically understated the Arandas' income, resulting in an

2   artificially inflated DTI and directly causing the denial of their April 2021

3   preapproval request.  AMF, No. 40.

4      (5)     NMAC removed two of the three lease accounts in June 2021, and the

5   Arandas could have qualified for a mortgage even if Toledo had erroneously

6   included the payment on the remaining account in their DTI calculation, and even if

7   she continued to use understated income figures for the Arandas.  AMF, No. 49.

8      (6)     The Arandas had only minimal assets available for a down payment, as

9   well as an outstanding $31,980 federal tax lien and a $16,245 judgment to Chase.

10  They did not have enough money to pay off those liens and still afford the down

11  payment for a home, according to their mortgage expert's own analysis.  AMF, Nos.

12  41-45.

13     (7)     Most importantly, ***the Arandas were in fact preapproved for a***

14  ***mortgage in October 2020,*** by a different mortgage lender who correctly calculated

15  their income.  AMF, Nos. 46-47.

16          Aranda's other argument is that she experienced significant emotional distress

17  as a result of not being preapproved for a mortgage or being able to buy a home.

18  SUF Nos. 162-167 and evidence cited therein.  However, a plaintiff cannot rely

19  upon her own self-serving testimony to prove she suffered emotional distress and

20  that it was caused by the defendant.  Conclusory assertions of emotional distress are

21  insufficient even at the motion to dismiss stage in FCRA cases.  *Franklin v. Trans*

22  *Union, LLC*, 2019 WL 6871254, at *4 (C.D. Cal. 2019); *Campbell v. Anniemac*

23  *Home Mortg*., 2017 WL 8180578, at *2 (C.D. Cal. 2017).  For similar reasons,

24  Plaintiff's self-serving deposition testimony cannot prove it is uncontroverted that

25  she suffered harm caused by NMAC for purposes of summary judgement.  And

26  since all of the emotional distress and other harm alleged by Plaintiff flows from her

27  alleged inability to obtain a mortgage preapproval or buy a home, SUF, Nos. 162-

28

167, NMAC is entitled to present evidence that the credit denial that supposedly caused her distress did not flow from NMAC's reporting.

Further, the Arandas *were* preapproved for a mortgage, in October 2020, when Aranda's husband Sergio pulled her credit report and successfully applied for a mortgage in her name.  AMF, Nos. 46, 48.  If Plaintiff's testimony is to be believed that she never learned she had been approved for a mortgage until nearly two years later because her husband never told her, then any emotional distress Plaintiff suffered was caused by this non-disclosure rather than NMAC's conduct.

Therefore, Plaintiff has not established that she suffered emotional distress caused by NMAC's reporting such that no reasonable juror could find otherwise.

**D.    Genuine Factual Disputes Exist Regarding Willfulness.**

Finally, Aranda argues that NMAC's reporting of information on her lease accounts was reckless to the point that this Court should summarily adjudicate the willfulness issue in her favor.  Aranda does not present any evidence of willfulness on NMAC's part, but rather rehashes her arguments that its reporting on her accounts was so patently incorrect that NMAC's behavior should be deemed reckless.  See MSJ, pp. 24-25.  NMAC responded to each of these arguments and summarized the contradictory evidence above.

To bolster this claim, Aranda asserts that NMAC changed its credit reporting policy "to circumvent the applicable time limitations of adverse and charged off information as set forth by the FCRA."  MSJ, 24:21-24.  Aranda cites no evidence to support this assertion of malicious intent, and there is none.  As already explained, there are no time limitations on when a creditor may furnish information on accounts; NMAC's revised credit reporting policy was more favorable to consumers and complied with state law that prohibits derogatory reporting based on unpaid end of lease charges; and, NMAC voluntarily stopped furnishing information of two of Plaintiff's three accounts when they were ten years old.  All of this evidence negates

Aranda's claim of willfully inaccurate reporting by NMAC, and it evidences that genuine disputes of material fact that preclude summary judgment.

## VI.  CONCLUSION

For all of the reasons set forth above, the Court should deny Aranda's motion for partial summary judgment, and instead enter judgment in NMAC's favor on its cross-motion for summmpp. ary judgment.

DATED:  November 22, 2022

SEVERSON & WERSON
A Professional Corporation


By:    /s/ Mark D. Lonergan
         MARK D. LONERGAN

Attorneys for Defendant NISSAN MOTOR ACCEPTANCE COMPANY LLC f/k/a NISSAN MOTOR ACCEPTANCE CORPORATION