Youssef H. Hammoud (SBN: 321934)
Lauren Tegan Rodkey (SBN: 275830)
**PRICE LAW GROUP, APC**
6345 Balboa Blvd., Suite 247
Encino, CA 91316
T: (818) 600-5596
F: (818) 600-5596
E: youssef@pricelawgroup.com
E: tegan@pricelawgroup.com
*Attorneys for Plaintiff,*
*Mayra Aranda*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAYRA ARANDA, | Case No. 2:21-cv-03451-CBM-PD |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT NISSAN MOTOR ACCEPTANCE CORPORATION'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| NISSAN MOTOR ACCEPTANCE CORPORATION, | |
| Defendant. | |

Plaintiff Mayra Aranda ("Plaintiff" or "Mayra"), by and through the undersigned counsel, hereby submits this Memorandum in Opposition to Defendant Nissan Motor Acceptance Company LLC f/k/a Nissan Motor Acceptance Corporation's ("Defendant" or "NMAC") Motion for Summary Judgment [Doc. 103] ("Motion").

i

# TABLE OF CONTENTS

I.   Introduction ........................................................................................... - 1 -

II.  Factual background .............................................................................. - 3 -

   A.  Lease of Three Nissan Vehicles ...................................................... - 3 -

   B.  Plaintiff's Financial Hardship ......................................................... - 3 -

   C.  Plaintiff's use of Credit Karma ....................................................... - 4 -

   D.  Discovery of Defendant's violations ............................................... - 5 -

   E.  Plaintiff's FCRA Claim .................................................................. - 6 -

III. Legal Standard. .................................................................................... - 7 -

   A.  Summary Judgement Standard ....................................................... - 7 -

   B.  **Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et. seq.* and California Consumer Reporting Agencies Act ("CCRAA"), Cal. Civ. Code § 1785 *et. seq.* ........................................................ - 8 -**

IV. Argument ............................................................................................. - 9 -

   A.  Statute of limitations under the FCRA and CCRAA ........................ - 9 -

      1. Applicability of statute of limitations under the FCRA .................... - 9 -

        a.   15 U.S.C. § 1681e(b) statute of limitations ................................... - 9 -

        b.   15 U.S.C. § 1681i and 1681s-2(b) statute of limitations .............. - 10 -

      2. Applicability of statute of limitations under the CCRAA ............... - 12 -

        a.   Plaintiff's Cal. Civ. Code § 1785.25(a) claims are timely .......... - 12 -

        b.   Plaintiff did not know and should not have known of the violation(s) until April 2021 ...................................................... - 14 -

        c.   Defendant materially and willfully misrepresented information . - 16 -

**3. Neither Mayra nor Sergio knew of the inaccurate reporting until April 2021, and in any case, Sergio was not Plaintiff's agent** ................... - 17 -

**4. Plaintiff's FCRA claim is viable** ............................................. - 19 -

   *a.   Trinity Warner v. Experian Information Solutions, Inc., 931 F.3d 917 (9th Cir. 2019)* ............................................................. - 20 -

   *b.   Roybal v. Equifax, Transunion, Experian, Rickenbacker, Medamerica, City Towing Body Shop, Inc., 405 F. Supp. 2d 1177 (E.D. Cal. 2005)* ........................................................... - 22 -

   *c.   Nelson v. Chase Manhattan Mortg. Corp., 282 F.3d 1057 (9th Cir. 2002)* ....................................................................... - 23 -

   d.   Continued reporting of inaccurate information after suit is filed and notification from a CRA supports a finding of willfulness .......... - 25 -

**V.   CONCLUSION** ................................................................... - 25 -

iii

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Anderson v. Equifax Info. Servs. LLC,*
4
   292 F. Supp. 2d 1211 (D. Kan. 2017) ................................................. - 10 -, - 11 -

5

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ............................................................................................ - 7 -
6

*Aryeh v. Canon Bus. Sols., Inc.*,
7
   55 Cal. 4th 1185, 151 Cal. Rptr. 3d 827, 292 P.3d 871 (2013) ............. - 13 -, - 14 -

8

*Austin v. Pawtucket Credit Union*,
   Civil Action No. 18-10699-FDS, 2019 U.S. Dist. LEXIS 145958 (D. Mass. May
9
   17, 2019).............................................................................................................. - 23 -

10

*Broccuto v. Experian Info. Sols., Inc.*,
11
   Civil Action No. 3:07CV782-HEH, 2008 U.S. Dist. LEXIS 37079 (E.D. Va. May
   6, 2008).............................................................................................................. - 12 -
12

*Celotex Corp. v. Catrett,*
13
   477 U.S. 317 (1986) ......................................................................................... - 7 -

14

*Chipka v. Bank of Am.,*
15
   355 F. App'x 380 (11th Cir. 2009)..................................................................... - 9 -

16

*Cortez v. Trans Union, LLC,*
   617 F.3d 688 (3d. Cir. 2010) ......................................................... - 8 -, - 15 -

17

*Equifax Inc. v. F.T.C.,*
18
   678 F.2d 1047 (11th Cir. 1982) ....................................................................... - 8 -

19

*Gorman v. Wolpoff & Abramson, LLP,*
   584 F.3d 1147 (9th Cir. 2009) ......................................................................... - 23 -
20

*Grigoryan v. Experian Info. Sols., Inc.*,
21
   84 F. Supp. 3d 1044 (C.D. Cal. 2014).............................................................. - 8 -

22

*Guimond v. Trans Union Credit Info. Co.,*
   45 F.3d 1329 (9th Cir. 1995) ....................................................... - 8 -, - 15 -
23

*Hauge v. AmeriHome Mortg. Co., LLC,*
24
   565 F. Supp. 3d 1 (D. Mass. 2021)................................................................... - 24 -

25

26

27

iv

28

*Hernandez v. McDowell*,
No. EDCV 18-01284-JVS (RAO), 2022 U.S. Dist. LEXIS 40203 (C.D. Cal. Jan. 24, 2022) ............................................................................................. - 7 -

*Hogar Dulce Hogar v. Community Development Commission*
(2003) 110 Cal. App. 4th 1288 [2 Cal. Rptr. 3d 497]) ..................................... - 13 -

*Hyde v. Hibernia Nat'l Bank*,
861 F.2d 446 (5th Cir. 1988) ......................................................................... - 11 -

*Jones v. Federated Fin. Reserve Corp.*,
144 F.3d 961 (6th Cir. 1998) ........................................................................... - 8 -

*Larson v. Ford Credit*,
No. 06-CV-1811, 2007 U.S. Dist. LEXIS 47181 (D. Minn. June 28, 2007) .. - 14 -

*Lawrence v. Trans Union L.L.C.*,
296 F. Supp. 2d 582 (E.D. Pa. 2003) ............................................................ - 11 -

*Maiteki v. Marten Transp. Ltd.*,
4 F. Supp. 3d 1249 (D. Colo. 2013) ............................................................... - 14 -

*Marchisio v. Carrington Mortg. Servs., LLC*,
919 F.3d 1288 (11th Cir. 2019) ..................................................................... - 24 -

*Marcinski v. RBS Citizens Bank, N.A.*,
36 F. Supp. 3d 286 (S.D.N.Y. 2014) ............................................................. - 14 -

*Milgram v. Chase Bank USA, NA*,
No. 19-609-29, 2020 U.S. Dist. LEXIS 12411 (S.D. Fla. Jan. 25, 2020) ....... - 14 -

*Nelson v. Chase Manhattan Mortg. Corp.*,
*282 F.3d 1057 (9th Cir. 2002)* .......................................................... - 21 -, - 22 -

*Owens v. Transunion*,
Civil Action No. 4:20-cv-655-SDJ-KPJ, 2021 U.S. Dist. LEXIS 187069 (E.D. Tex. Aug. 30, 2021) ......................................................................... - 10 -, - 14 -

*Peasley v. Verizon Wireless (VAW) LLC*,
364 F. Supp. 2d 1198 (S.D. Cal. 2005) .......................................................... - 21 -

*Rogers v. Equifax Info. Servs. LLC*,
NO. CV 14-1708-JFW (AGRx), 2015 U.S. Dist. LEXIS 16654 (C.D. Cal. Jan. 13, 2015) ....................................................................................................... - 16 -

v

*Roybal v. Equifax, Trans Union, Experian Rickenbacker, Medamerica, City Towing Body Shop, Inc.*,
  405 F. Supp. 2d 1177 (E.D. Cal. 2005) ...................................- 18 -, - 20 -, - 21 -

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007) ................................................................... - 23 -

*See Fed. R. Civ. P. 56* .................................................................- 7 -

Thomas v. Wells Fargo Bank, N.A.,
  No. 1:17-CV-3146-TWT-JSA, 2018 U.S. Dist. LEXIS 130738 (N.D. Ga. May 30, 2018) ................................................................................. - 12 -

*Trinity Warner v. Experian Information Solutions, Inc.*,
  *931 F.3d 917 (9th Cir. 2019)* ............................................... - 19 -, - 20 -

*Vasquez v. Bank of Am., N.A.*,
  No. 15-cv-04072-RS, 2015 U.S. Dist. LEXIS 154682 (N.D. Cal. Nov. 13, 2015) - 14 -

*Ware v. Bank of Am. Corp.*,
  9 F. Supp. 3d 1329 (N.D. Ga. 2014) ............................................- 9 -

*Wylie v. First Nat'l Bank Corp.*,
  No. 3:18-cv-239, 2019 U.S. Dist. LEXIS 114005 (W.D. Pa. July 10, 2019) .- 15 -

*Young v. LVNV Funding LLC*,
  No. 12 CV 1180, 2013 U.S. Dist. LEXIS 122225 (E.D. Mo. Aug. 28, 2013) - 14 -


**Statutes**

California Consumer Credit Reporting Agencies Act,
  Cal. Civ. Code § 1785.25 ...................................- 13 -, - 15 -, - 19 -, - 23 -

California Consumer Credit Reporting Agencies Act,
  *Cal. Civ. Code § 1785.31* .......................................................- 13 -

California Consumer Credit Reporting Agencies Act,
  Cal. Civ. Code § 1785.33 ........................................................- 9 -

Fair Credit Reporting Act,
  15 U.S.C. § 1681a .................................................................- 10 -

Fair Credit Reporting Act,
  15 U.S.C. § 1681e ...........................................................- 9 -, - 10 -

vi

Fair Credit Reporting Act,
    15 U.S.C. § 1681i ...........................................................................passim

Fair Credit Reporting Act,
    15 U.S.C. § 1681m ............................................................................ - 9 -

Fair Credit Reporting Act,
    15 U.S.C. § 1681p ................................................................. - 9 -, - 12 -

Fair Credit Reporting Act,
    15 U.S.C. § 1681s ...........................................................................passim

Fair Credit Reporting Act,
    15 U.S.C. §§ 1681b ............................................................................ - 9 -

**Rules**

*Fed. R. Civ. P. 56(a)* ................................................................................. - 6 -

vii

## I.     Introduction

Plaintiff Mayra Aranda ("Plaintiff" or "Mrs. Aranda") previously leased three automobile vehicles from Defendant Nissan Motor Acceptance Corporation ("Defendant" or "NMAC"). Two of the leases were opened in July and August 2007, (the "9261" and "4106" Accounts, respectively), and the third lease was opened in January 2011 (the "7100" Account), (collectively the "Accounts"). The vehicles associated with the 9261 and 4106 Accounts were returned to Defendant on December 29, 2010 and the vehicle associated with the 7100 Account was returned to Defendant on June 28, 2013.

Plaintiff and her husband, Sergio Aranda ("Mr. Aranda" or "Sergio"), have testified that they did not receive any communications, via telephone or mail, regarding any alleged balances owed with respect to the vehicles after they were returned to Defendant. Moreover, Defendant has no record that it, or any debt collector on its behalf, ever placed any telephone calls to Plaintiff informing her of the alleged outstanding balance.

Additionally, the only documents produced by Defendant were liability statements and reminder statements that were allegedly mailed for the 9261 and 7100 Accounts. However, the letters produced by Defendant reflect they were sent to an incorrect address, and Plaintiff (and her husband), have testified that they did not receive any letters from Defendant concerning any amounts allegedly owed with respect to any of the three Accounts.

Despite never being informed of alleged outstanding balances, Defendant proceeded to charge-off the three Accounts and reported each of the three Accounts as charged-off, with a date of first delinquency to the credit reporting agencies.

- 1 -

In or around 2011, Plaintiff and her husband began to experience financial difficulties as a result of Mr. Aranda losing his job. As a result, Plaintiff fell behind on a number of different payment obligations and her credit score/worthiness took a tumble. Because of this, and understanding that time would "heal" her credit, Plaintiff did not review the details of her credit report, other than simply checking her credit score from time to time. Over the next several years, the adverse and/or charged off accounts began to fall off her credit report due to being obsolete under the Fair Credit Reporting Act, 15 U.S.C. § 1681, et. seq., and as a result, Plaintiff's credit score began to slowly increase.

Sometime in or around 2016, Defendant changed its credit reporting policy to no longer report a charged off status and to remove any negative payment history and/or statuses associated with terminated lease accounts. As such, the three Accounts began to report as open with a balance, a status of current and paid or paying as agreed. The reporting materially and willfully misrepresented the information associated with the Accounts in such a way that initially, the change in reporting had a positive impact upon Plaintiff's credit score, but simultaneously, had numerous other non-credit score related material impacts that were not apparent until Plaintiff attempted to obtain a mortgage pre-approval.

In addition, the Accounts continued to remain on her credit report with high balances and scheduled payment obligations after the Accounts had become obsolete and therefore, were no longer appropriate to report and considered inaccurate under the FCRA and CCRAA. However, due to Defendant's material and willful misrepresentation of the Accounts, Plaintiff did not discover any of the violations until April 2021. In fact, the only reason that the violations were discovered was because Plaintiff attempted to obtain a mortgage pre-approval and was denied due

- 2 -

to her excessive debt-to-income ratio, a noncredit-score related qualification. At that time, the mortgage loan officer, Sandra Toledo ("Ms. Toledo"), brought to Plaintiff's attention that there were three Nissan Lease Accounts opened with a balance, reported as currently being paid as agreed, with scheduled monthly payments totaling $1,903. Thereafter, Plaintiff filed this action.

## II.     Factual background

### A. Lease of Three Nissan Vehicles

Plaintiff leased three different Nissan-Infiniti Vehicles from Defendant, one in July 2007 ("9261 Account", one in August 2007 ("4106 Account"), and one in January 2011 ("7100 Account"), (collectively the "Accounts"). (Plt's Add'l Stmt. of Uncontroverted Facts, ¶1-4). The vehicles associated with the 9261 and 4106 Accounts were both returned to Defendant on December 29, 2010. (*Id.* at ¶5). The vehicle associated with the 7100 Account was returned to Defendant on June 28, 2013. (*Id.* at ¶6). There is no evidence in the record reflecting any collection calls by Defendant (or a third-party debt collector) to Plaintiff at any time after the return of the vehicles. (*Id.* at ¶7). The only evidence in the record reflects that liability statements were allegedly sent to Plaintiff regarding only the 9261 and 7100 Accounts. (*Id.* at ¶8). However, the liability statements produced by Defendant have the incorrect mailing address listed. (*Id.* at ¶9). As such, Plaintiff (or her husband) were never made aware that there was an alleged balance owed to Defendant with respect to any of the three Accounts. (*Id.* at ¶10).

### B. Plaintiff's Financial Hardship

In or around 2011, Plaintiff's husband, Mr. Aranda, lost his job. (*Id.* at ¶11). Mr. Aranda was out of a job for almost a year, causing the Arandas to suffer from a significant decrease in their monthly income, and causing Plaintiff to fall behind on

- 3 -

a number of their monthly credit obligations. (*Id.* at ¶12). As a result of the financial hardship and inability to keep up with her different payments, Mrs. Aranda's credit score was significantly decreased as adverse credit information began to populate her credit report. (*Id.* at ¶13).

Defendant was even made  aware that the Plaintiff was going through financial difficulties, as the 7100 Account notes reflect that payments could no longer be made because the Arandas needed to feed their kids. (*Id.* at ¶16). Understanding that her credit score and overall credit worthiness was significantly impacted and that time would "heal" her credit, Plaintiff made no effort to review the contents of her credit report, other than checking her credit score from time to time. (*Id.* at ¶17-18). Plaintiff understood that her credit would be negatively impacted for the next several years, and that only through the passage of time would she begin to see an increase in her credit score. (*Id.* at ¶17-19).

## C. Plaintiff's use of Credit Karma

In or around 2017, Plaintiff signed up with Credit Karma for the express purpose of viewing her credit score from time to time, for free and without any harm to her credit. (*Id.* at ¶20). To check her credit score, Plaintiff simply had to open the Credit Karma app on her phone and the credit score would appear right before her eyes on the main page. (*Id.* at ¶22). Plaintiff used the app to check her credit score without ever reviewing the complete contents of her credit information and/or credit reports. (*Id.* at ¶23).  As time passed, Plaintiff's credit score slowly began to increase (*Id.* at ¶25).

Collection accounts are adverse/derogatory accounts, and are brought to a user's attention within the Credit Karma app. (*Id.* at ¶27). At some point in time,

- 4 -

Plaintiff disputed one or more collection accounts appearing on her Credit Karma app that were identified as adverse collection accounts. (*Id.* at ¶28).

However, Plaintiff never saw the three Accounts while using her Credit Karma app. (*Id.* at ¶29). Further, even if the three Accounts were reporting via Credit Karma, Defendant was reporting the three Accounts at issue as current and paying or paid as agreed, without any charge-off or negative statuses. (*Id.* at ¶30-31). Therefore, the Accounts would not have been labeled as adverse by Credit Karma, and event rans Union views the Accounts as in good standing. (*Id.* at ¶30-31).

Moreover, Defendant implemented the credit reporting policy at issue in 2016, which materially and willfully misrepresented the information regarding the three Accounts at issues. (*Id.* at ¶31). As a result of the credit reporting policy change, any charged off statuses and/or negative statuses were removed by Defendant. (*Id.* at ¶31).

Defendant's material and willful misrepresentation of the information it furnished, coupled with Plaintiff's concern for only checking her credit score, supports the position that she did not know nor should she have known of Defendant's violations. (*Id.* at ¶32-34). It was only when the non-credit score related materials were reviewed as part of a mortgage application did Plaintiff first discover Defendant's violations. (*Id.* at ¶32-39).

Defendant's own 30(b)(6) representative, Keith Weiber, testified that he has NEVER reviewed his credit reports before and only checks the credit score sent to him by his bank. (*Id.* at ¶26).

**D. Discovery of Defendant's violations**

In or around April 2021, Plaintiff and her husband were attempting to obtain a mortgage pre-approval with Sandra Toledo ("Ms. Toledo"). (*Id.* at ¶35).On or

about April 15, 2021, Ms. Toledo informed the Arandas they were unable to obtain a mortgage pre-approval because their debt-to-income ratio was too high. (*Id.* at ¶36). Ms. Toledo further informed the Arandas that Plaintiff had three Nissan-Infiniti Accounts reporting on her credit reports as open, with a balance, and scheduled monthly payments totaling $1,903. (*Id.* at ¶37). The three Accounts were considered as monthly debt obligations and utilized in the calculations to determine whether the Arandas were eligible for a mortgage pre-approval. (*Id.* at ¶38).

At that point, Plaintiff and her husband, for the first time, learned about the inaccurate reporting regarding the three Accounts was in April 2021. (*Id.* at ¶32-39).

**E.  Plaintiff's FCRA Claim**

On or about April 22, 2021, Plaintiff filed the instant lawsuit, disputing that the reporting of the three Accounts at issue was inaccurate. (*Id.* at ¶45). Plaintiff's lawsuit disputed the reporting of the three Accounts and provided the reasons in support of her dispute. (*Id.* at ¶46). Plaintiff, with the help of her attorneys, prepared, reviewed and approved the Complaint prior to its filing. (*Id.* at ¶47). Subsequent to the filing, Plaintiff served her Complaint, which outlined her disputes regarding the three Accounts at issue upon Experian Information Solutions, Inc. (Doc. 14) (*Id.* at ¶48).

In response to Plaintiff's Complaint, in which she disputed the three Accounts as reporting inaccurately, Experian notified Defendant of the Plaintiff's disputes in communications called ACDVs, which are transmitted to Defendant through an electronic system called e-OSCAR. (*Id.* at ¶49). On or about June 16, 2021, Defendant received an ACDV from Experian disputing the information reporting on the 7100 Account ("7100 ACDV"). (*Id.* at ¶50). The 7100 ACDV indicated that

Experian was reporting the 7100 Account as "OPEN/CURRENT," with a balance of $9,019, a scheduled payment of $652 and a date of last payment as August 8, 2013. (*Id.* at ¶51). Defendant responded to the 7100 ACDV verifying the status as "OPEN/CURRENT," verified the balance of $9,019, verified the scheduled payment of $652, and updated the date of last payment to May 02, 2013. (*Id.* at ¶52). The results of the 7100 ACDV were not sent to Plaintiff by Experian. (*Id.* at ¶53).

On March 23, 2022, Plaintiff served a subpoena on Experian seeking various communications between Experian and Defendant. (*Id.* at ¶55). On April 8, 2022, Experian responded to the subpoena and produced a copy of the 7100 ACDV. (*Id.* at ¶56). The production of documents by Experian uncovered Defendant's failure to comply with its duties and obligations as set forth in the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b). *Id.* at ¶62-63. As such, Plaintiff amended her Complaint to assert the newly discovered FCRA claim. (Doc. 64); *Id.* at ¶57.

## III. Legal Standard.

### A. Summary Judgement Standard

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. An issue is "genuine" only if a sufficient evidentiary basis exists upon which a reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-249 (1986). A factual dispute is "material" only if it might affect the outcome of the suit under governing law. *Id.* at 248.

"The moving party bears the initial responsibility of presenting the basis of its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact." *Hernandez v.*

*McDowell*, No. EDCV 18-01284-JVS (RAO), 2022 U.S. Dist. LEXIS 40203, at *5 (C.D. Cal. Jan. 24, 2022) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the moving party meets its initial burden, the burden shifts to the opposing party to demonstrate the existence of a genuine issue of material fact with specific facts." *Id.* (citing *Anderson*, 477 U.S. at 248-49). "The parties must support their assertions that a material fact cannot be or is genuinely disputed by (1) citing materials in the record, (2) showing that materials cited do not establish an absence or presence of genuine dispute, or (3) showing that the adverse party lacks admissible evidence to support its factual position." *Id.*; *See Fed. R. Civ. P. 56(c)(1)(A)-(B)*.

In considering a motion for summary judgment, the Court must examine all evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

**B. Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et. seq.* and California Consumer Reporting Agencies Act ("CCRAA"), Cal. Civ. Code § 1785 *et. seq.***

The CCRAA mirrors the FCRA. *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1335 (9th Cir. 1995). "The stated purpose of the FCRA is to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." *Equifax Inc. v. F.T.C.*, 678 F.2d 1047, 1048 (11th Cir. 1982). Congress intended "to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d. Cir. 2010) (quoting *Guimond,* 45 F.3d at 1333). In *Cortez,* the Third Circuit stated that "interpretation of this remedial statute must reflect those

- 8 -

objectives," and in *Guimond*, the Ninth Circuit held that the objectives of the FCRA support a "liberal construction." *See id.; see also Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961 ,964 (6th Cir. 1998) (courts interpretating the FCRA are "guided by the fact that the FCRA is to be liberally construed in favor of the consumer").

The FCRA statute of limitations and the CCRAA statute of limitations are treated the same by California District Courts. *Grigoryan v. Experian Info. Sols., Inc.*, 84 F. Supp. 3d 1044, 1058 (C.D. Cal. 2014) ("Despite the different statutes of repose provided, and the CCRAA provision concerning willful concealment, the statutes are treated "the same" by courts.").

## IV.   Argument

### A. Statute of limitations under the FCRA and CCRAA

#### 1.   Applicability of statute of limitations under the FCRA

"To achieve its purpose, the FCRA places distinct obligations on three types of entities: consumer reporting agencies [], users of consumer reports, and furnishers of information to CRAs." *Ware v. Bank of Am. Corp.*, 9 F. Supp. 3d 1329, 1337 (N.D. Ga. 2014) (citing 15 U.S.C. §§ 1681b, 1681m, 1681s-2; *Chipka v. Bank of Am.,* 355 F. App'x 380, 382 (11th Cir. 2009)). The statute of limitations for both the FCRA and CCRAA only begins to run when a ***violation*** occurs. *See*, Cal. Civ. Code § 1785.33 (An action must be brought within two years from the date . . . of the **violation**); *See also,* 15 U.S.C. § 1681p (same).

##### a.   15 U.S.C. § 1681e(b) statute of limitations

Section 1681e(b) provides: "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

Congress was aware that consumer reporting agencies ("CRAs") prepare consumer reports on an ongoing and repeat basis, and made the consumer reports themselves the gravamen of § 1681e, whenever they are prepared. This means that § 1681e(b) of the FCRA imposes duties "*[w]henever* a consumer reporting agency prepare a consumer report." (emphasis added). Congress did not focus the duties in § 1681e(b) upon maintenance of the credit file, but instead chose to impose a duty each and every time the CRA prepares a consumer report. The FCRA does not impose a one-time duty upon a CRA at the time of insertion of false information, but rather imposes a duty "[w]henver a consumer reporting agency prepares a consumer report."

Therefore, with respect to § 1681e(b), the statute of limitations runs at the time a violation occurs, which is "***whenever***" the CRA prepares a consumer report and fails to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." *See Anderson v. Equifax Info. Servs. LLC,* 292 F. Supp. 2d 1211, 1218-19 (D. Kan. 2017); *Owens v. Transunion*, Civil Action No. 4:20-cv-655-SDJ-KPJ, 2021 U.S. Dist. LEXIS 187069, at 21 (E.D. Tex. Aug. 30, 2021) (holding that the republishing of an error gives rise to a new limitations period) (*citing Hyde v. Hibernia Nat'l Bank*, 861 F.2d 446 (5th Cir. 1988) ("[e]ach transmission of the same credit report is a separate and distinct tort to which a separate statute of limitations applies).

**b. 15 U.S.C. § 1681i and 1681s-2(b) statute of limitations**

Section 1681i(a) states that a CRA is required to conduct a reinvestigation "if the completeness or accuracy of any item of information contained in a consumer's file as a consumer reporting agency is disputed by the consumer and the consumer notifies the agency . . . ." Moreover, the CRA is required to complete the reinvestigation "before the end of the 30-day period beginning on the date on which

- 10 -

the agency receives the notice of the dispute from the consumer or reseller." *Id.* This means that each time an item of incomplete or inaccurate information is disputed by the consumer, it triggers the CRA's duty to reinvestigate. Once a CRA fails to comply with its duty to reinvestigate as outlined in § 1681i(a), a separate and distinct ***violation*** occurs. Thus, the statute of limitations with respect to § 1681i(a) runs when a violation occurs: when information contained in a consumer's file is disputed, triggering the CRA's reinvestigation obligations, and the CRA fails to conduct a reasonable reinvestigation. *See Anderson*, 292 F. Supp. 2d 1211; *See also, Lawrence v. Trans Union L.L.C.*, 296 F. Supp. 2d 582, 587 (E.D. Pa. 2003);

Likewise, Section 1681s-2(b)(1) requires a furnisher, such as Defendant to:

> (1) Conduct an investigation with respect to the disputed information; (2) review all of the relevant information provided in the notice from the consumer reporting agency; (3) report the results of its investigation to the consumer reporting agency; (4) if the investigation reveals incomplete or inaccurate information, report those findings to the other major consumer reporting agencies to which it provided the incomplete or inaccurate information; and (5) modify, delete, or permanently block the reporting of any information disputed by a consumer that it finds to be inaccurate or incomplete or that cannot be verified after reinvestigation.

"It is the failure to act as prescribed by the statute after receiving notice of a dispute which creates the cause of action" under § 1681s-2(b), and which constitutes the "violation" for purposes of § 1681p(1). Thomas v. Wells Fargo Bank, N.A., No. 1:17-CV-3146-TWT-JSA, 2018 U.S. Dist. LEXIS 130738, at *20 (N.D. Ga. May 30, 2018) (*quoting Broccuto v. Experian Info. Sols., Inc.*, Civil Action No. 3:07CV782-HEH, 2008 U.S. Dist. LEXIS 37079, at *8 (E.D. Va. May 6, 2008). The statute of limitations accrues based on the date the violation was discovered by the

- 11 -

consumer, not the date the consumer first observed inaccurate information on their credit report. *Broccuto*, 2008 U.S. Dist. LEXIS 37079, at \*8. Thus, the statute of limitations, given by the FCRA's plain language, begins to accrue from the date that a furnisher failed to act as required by the statute.

### 2.  Applicability of statute of limitations under the CCRAA
#### a.  Plaintiff's Cal. Civ. Code § 1785.25(a) claims are timely

Cal. Civ. Code § 1785.25(a) states that "[a] person shall not furnish information on a specific transaction or experience to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate." A violation of this section occurs only after two elements are satisfied: (1) a reporting of inaccurate information, which (2) the furnisher knows or should know is inaccurate. Moreover, each and every time a person willfully furnishes information "the person knows or should know" to be incomplete or inaccurate, is a separate and distinct violation that would trigger its own statute of limitations period. *See Cal. Civ. Code § 1785.31(a)(2)(B)*

"[U]nder the theory of continuous accrual, series of wrongs or injuries may be viewed as each triggering its own limitations period, such that a suit for relief may be partially time-barred as to older events but timely as to those within the applicable limitations period." *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1192, 151 Cal. Rptr. 3d 827, 832, 292 P.3d 871, 875-76 (2013). "[C]ontinous accrual applies whenever there is a continuing or recurring obligation: 'When an obligation or liability arises on a recurring basis, a cause of action accrues each time a wrongful act occurs, triggering a new limitations period.'" *Id.* at 1199. (*quoting Hogar Dulce Hogar v. Community Development Commission* (2003) 110 Cal. App. 4th 1288, 1295 [2 Cal. Rptr. 3d 497]).

The plain language of the CCRAA creates a duty that arises each and every time Defendant furnished information to the credit reporting agencies, in which it was required to **NOT** furnish information "on a specific transaction or experience" that it knows or should know is incomplete or inaccurate. In so doing, Defendant had a "continuing or recurring obligation" that once violated, triggered a new limitations period. *Aryeh*, 55 Cal. At 1185.

This proposition is in line with the majority of Courts similarly interpreting the FCRA and concluding that each time a duty to investigate is triggered and a furnisher fails to reasonably investigate, results in a new FCRA violation. *See Vasquez v. Bank of Am., N.A.*, No. 15-cv-04072-RS, 2015 U.S. Dist. LEXIS 154682, at *8 (N.D. Cal. Nov. 13, 2015)[1]

Here, Defendant was furnishing information about the three Accounts at issue on a monthly basis to the three major credit reporting agencies. (*Id.* at ¶40-41). The CCRAA imposes a duty on Defendant to NOT furnish information it knows or should know to be inaccurate to the credit reporting agencies each and every time such a furnishing occurs. *See Cal. Civ. Code § 1785.25(a).* Defendant furnished information about the three Accounts to the CRAs on a monthly basis. (*Id.* at ¶40-41). Each subsequent monthly furnishing contained **updated account information** that modified the status of the three Accounts and updated the date of last activity for the new month. (*Id.* at ¶40-42)

---

[1] *See also, Marcinski v. RBS Citizens Bank, N.A.*, 36 F. Supp. 3d 286, 290 (S.D.N.Y. 2014)); *see also, e.g., Maiteki v. Marten Transp. Ltd.,* 4 F. Supp. 3d 1249, 1253-1253-54 (D. Colo. 2013); *Young v. LVNV Funding LLC*, No. 12 CV 1180, 2013 U.S. Dist. LEXIS 122225, at *3 (E.D. Mo. Aug. 28, 2013); *Brocutto,* 2008 U.S. Dist. LEXIS 37079 at *4); *Larson v. Ford Credit,* No. 06-CV-1811, 2007 U.S. Dist. LEXIS 47181, *4 (D. Minn. June 28, 2007); *See also, Owens,* 2021 U.S. Dist. LEXIS 187069 at *19); *Milgram v. Chase Bank USA, NA*, No. 19-609-29, 2020 U.S. Dist. LEXIS 12411 at *5 (S.D. Fla. Jan. 25, 2020); *Wylie v. First Nat'l Bank Corp.*, No. 3:18-cv-239, 2019 U.S. Dist. LEXIS 114005, at *4 (W.D. Pa. July 10, 2019).

This means that, at a minimum, Defendant's monthly furnishings to the credit reporting agencies that occurred within 2 years of the filing of this lawsuit and contained information Defendant knew or should have known was inaccurate, are treated as separate and distinct violations triggering a new limitations period at the time of the violation. Plaintiff's position is reflective of the purpose of the CCRAA (and the FCRA), which is intended to "protect consumers from the transmission of inaccurate information about them" and is to be liberally construed. *See Cortez,* 617 F.3d at 688 and *Guimond,* 45 F.3d at 1329. The judicial weight of authority supports Plaintiff's position, and thus, the Court should find that Plaintiff's claims as they relate to the monthly furnishings that occurred within the two years preceding the filing of the Complaint are timely. [2]

### b. Plaintiff did not know and should not have known of the violation(s) until April 2021

Defendant's Motion is filled with blatantly untrue statements. First, Defendant, without any evidence, states that the Arandas "***closely monitored*** their credit for years prior to their April 2021 mortgage application." Doc. 103, pg. 18, ¶ 8-10. (emphasis added). The only thing that the Arandas have testified to checking was their credit scores. (*Id.* at ¶23; *See also, Plt's Stmt. Of Genuine Disputes of Material Facts,* ¶11). In fact, Plaintiff (and her husband) made it clear that the only type of "credit monitoring" they do, is check their credit score. (*Id.* at ¶23; *See also, Plt's Stmt. Of Genuine Disputes of Material Facts,* ¶11).

---

[2] "However, contrary to [defendant's] argument, the Court concludes that [plaintiff] has raised genuine issues of material fact as to whether [defendant] committed new CCRAA violations in 2013 by re-furnishing information to Equifax that it knew or should have known was incomplete or inaccurate." *Rogers v. Equifax Info. Servs. LLC,* NO. CV 14-1708-JFW (AGRx), 2015 U.S. Dist. LEXIS 16654, at *20 (C.D. Cal. Jan. 13, 2015).

- 14 -

Second, Defendant states that Equifax's records confirm dozens of consumer inquiries into Plaintiff's credit file prior to April 2019. (*Plt's Stmt. Of Genuine Disputes of Material Facts,* ¶1). However, the origin of those inquiries and what those inquiries consisted of is unknown, not just to any party in this lawsuit but to Equifax, the entity that generated the codes associated with the inquiries. (*Id.* at ¶1, 36). Equifax testified that it could not say who, or what originated those inquiries, and for Defendant to argue the inquiries originated with the Plaintiff is disingenuous. (*Id.* at ¶1, 36).

Third, Plaintiff never ordered her credit report from Trans Union in or around September 2019, she never received the September 6, 2019 from Trans Union either online or through the mail and she doesn't even have an online account with Trans Union. (*Id.* at ¶21-23). Regardless, the September 2019 report is within the two years preceding the filing of the Complaint. Therefore, even if the Plaintiff had received the September 6, 2019 Trans Union credit report (she did not), and discovered the violations (she did not), she timely filed suit on April 22, 2021, less than 2 years later.

Fourth, Credit Karma is an app used by members simply to view their credit report for free and without any harm to their credit. (Plt's Add'l Stmt. of Uncontroverted Facts, ¶20-22). Credit Karma understands that access to a credit score is valuable. (*Id.* at ¶20-22). The documents produced by Credit Karma purport to be logins onto Plaintiff's account, however, there is no evidence in the record to establish that the IP addresses belong to Plaintiff or her husband, or which of the log ons even belong to her.

Additionally, there is no record in the evidence establishing what Credit Karma was reporting regarding Plaintiff's accounts, from 2017 until the present day.

This is important because Credit Karma testified it was unaware if the information presented to a consumer when directly obtained from Trans Union or Equifax is presented in the same way through the Credit Karma app. (*Plt's Stmt. Of Genuine Disputes of Material Facts,* ¶15). In fact, there is no evidence in the record to reflect that the three Nissan Accounts at issue were even reporting in the Credit Karma app.

Defendant indicates that Plaintiff opened a dispute as to one of the three Accounts at issue in June of 2017. (*Id.* at ¶29-30). This is incorrect. The Credit Karma document produced indicates a "direct dispute" was opened as to a Nissan-Infiniti account but does not even identify the alleged account in any way. (*Id.* at ¶29-30). There is no way to know which account the alleged dispute was opened to. (*Id.* at ¶29-30). Moreover, the time at which the "Nissan-Infiniti direct dispute" was opened was one hour before Credit Karma reflects a log on to Plaintiff's Credit Karma account. (*Id.* at ¶29-30).How can a dispute allegedly be opened by the Plaintiff when nobody was logged into the account?

Defendant takes issue with the fact that Plaintiff (and her husband) use their Credit Karma accounts to check their credit score from time-to-time. However, Defendant's own 30(b)(6) representative indicated that he has **NEVER** reviewed his own credit report and only reviews the credit score sent to him by his bank. (*Plt's Add'l Stmt. of Uncontroverted Facts*, ¶26).

Again, the only evidence in the record reflects that Plaintiff did not know nor should she have known of the violations until April 2021 when she was denied a mortgage pre-approval.

### c. Defendant materially and willfully misrepresented information

Defendant materially and willfully misrepresented the information it furnished with respect to the three Accounts at issue. It is undisputed that Defendant

was reporting the three Accounts as charged off. (Def's Motion pg. 10, ¶ 1-46). However, sometime in 2016, under Defendant's new credit reporting policy, the reporting was changed to remove the "charged-off" status, any date of first delinquency, and reported the Accounts as "current" and being paid as agreed. (*Plt's Add'l Stmt. of Uncontroverted Facts.* at ¶31); *See also, Doc. 107*, ¶2-3.

Initially, the change in the credit reporting by Defendant had a positive impact on Plaintiff's credit score by removing the "charge-off" statuses and the dates of first delinquency, while simultaneously reporting that the Accounts were current and paid as agreed. However, the reporting had numerous other non-credit score related material impacts, specifically, Plaintiff's debt-to-income ratio, that was not readily apparent until Plaintiff submitted a mortgage application. In addition, the inaccurate reporting negatively impacted her credit score at a later time when the three Accounts remained on her credit report with high balances and payment obligations that were no longer appropriate for reporting as the Accounts had become obsolete.

The credit reporting policy implemented that caused Defendant to materially and willfully misrepresent the information reported occurred prior to Plaintiff opening her Credit Karma account. (*Id.* at ¶ 31). This is important because after the credit reporting policy change, the three Accounts were no longer labeled as adverse, making detection of the violations only possible when Plaintiff's non-credit score related qualifications were under review (i.e., applying for a mortgage which requires debt-to-income calculations). For these reasons, the Court should find that Plaintiff discovered the violations in April 2021, and her claims regarding the violations spanning back to the time Defendant changed the reporting until the present are timely.

### 3. Neither Mayra nor Sergio knew of the inaccurate reporting until April 2021, and in any case, Sergio was not Plaintiff's agent

- 17 -

Plaintiff (or her husband) have never argued, or even suggested, that Mr. Aranda was aware of the inaccurate information being reported by Defendant about the three Accounts. In fact, the evidence clearly shows that neither Plaintiff nor her husband were aware of the inaccurate reporting until sometime in April 2021 when they were attempting to obtain a mortgage pre-approval. (*Plt's Add'l Stmt. of Uncontroverted Facts*, ¶32-39). Any attempts by Defendant to argue otherwise is not supported by the record evidence and should be disregarded by the Court.

The Defendant indicates that Mr. Aranda successfully applied for a mortgage in both his name and Plaintiff's name with Rocket Mortgage. (Def's Mot. Pg. 22, ¶ 2-8). Defendant intentionally misstates the facts in an effort to mislead the Court knowing full well that neither Mr. Aranda nor Plaintiff applied for and obtained a mortgage with Rocket Mortgage. (*Id.* at ¶65-69). Rocket Mortgage issued a pre-qualification letter, not a mortgage approval. (*Id*).Rocket Mortgage never (1) received proof or verification of the Aranda's income or the Aranda's debts, it only acquired them verbally over the phone, (2) it did not receive a completed, final loan application, and (3) Rocket Mortgage never proceeded to establish the Arandas' eligibility for a mortgage. (*Id*). Because a loan application was never submitted, neither Mr. Aranda nor Plaintiff ever signed any documents with Rocket Mortgage, and no mortgage was obtained. In fact, had Mr. Aranda wanted to proceed with the submission of a full loan application to obtain a mortgage, he would have informed his wife as he does not make FINAL financial decisions without her knowledge or consent. (*Plt's Stmt. Of Genuine Disputes of Material Facts,* ¶9; *See also, Declaration of Plaintiff Mayra Aranda,* ¶16, 19).

- 18 -

Additionally, Mr. Aranda was never an authorized agent on behalf of the Plaintiff. There is nothing in the record to support that legal determination and Defendant has not met its burden to prove such a relationship existed. Further, there is no evidence in the record showing that Mr. Aranda ever logged into Plaintiff's Credit Karma app (let alone that Plaintiff ever even gave her husband her login credentials for Credit Karma), that he pulled her credit reports, or that he otherwise applied and obtained an extension of credit in her name. Defendant's argument seems to suggest that a husband, aware of his wife's information, somehow is considered an agent and can impute knowledge that does not exist.

The undisputed evidence in the record reflects that both Plaintiff and her husband were unaware of the inaccurate reporting by Defendant until April 2021. Examining all evidence in the light most favorable to Plaintiff and drawing all justifiable inferences in her favor, the Court should deny Defendant's Motion in its entirety.

**4. Plaintiff's FCRA claim is viable**

Defendant's arguments that Plaintiff never disputed NMAC's reporting prior to filing this lawsuit misunderstands the very cases it cites to support its arguments. It is undisputed that a claim under § 1681s-2(b) arises only after the following occurs:

First, a consumer disputes "the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency." *15 U.S.C. § 1681i(a)(1)(A)*. Second, the credit reporting agencies "have an obligation to investigate whether the claim is frivolous or irrelevant." *Roybal v. Equifax, Trans Union, Experian Rickenbacker, Medamerica, City Towing Body Shop, Inc.*, 405 F. Supp. 2d 1177, 1180 (E.D. Cal. 2005) (citing 15 U.S.C. § 1681i(a)(3)). Third,

- 19 -

"[o]nce a claim is deemed viable" the credit reporting agency must contact the furnisher of the credit information (Defendant NMAC) "which affords an opportunity to investigate and rectify erroneous reports." *Id.* (quoting 15 U.S.C. § 1681s-2(b)). The furnisher's (Defendant NMAC) "duty to investigate, however, does not arise unless it receives notice of the dispute" from the credit reporting agency directly. *Id.*

Additionally, Defendant's own credit expert, John Ulzheimer, testified that the FCRA does not direct consumers on how they are required to dispute inaccurate information, there is no law that requires a consumer follow any particular procedure to notify a credit reporting agency of their dispute of information on their credit report, and a consumer can dispute information on their credit report in many different ways, including through a lawyer. (*Plt's Add'l Stmt. of Uncontroverted Facts*, ¶58-64). Mr. Ulzheimer further testified that credit reporting agencies can ignore disputes they deem to be frivolous, that Experian treated Plaintiff's lawsuit as a dispute regarding the three Nissan Accounts, and that Experian was notified directly of the inaccurate information that Plaintiff disputed was in her credit report. (*Id*). Subsequently, Experian generated ACDVs that were forwarded to Defendant, and as a credit furnisher, Defendant was then obligated to review the ACDVs and consider all other relevant information it had in its possession. (*Id.*).

### a. *Trinity Warner v. Experian Information Solutions, Inc., 931 F.3d 917 (9th Cir. 2019)*

Defendant cites to *Trinity Warner* to support the idea that because the dispute did not come "directly" from the Plaintiff, it is invalid. However, Defendant's understanding and comparison of *Warner* is misplaced. In *Warner*, the plaintiff was working with a credit repair organization that was sending out a series of letters on plaintiff's behalf. *Id.* at 917. The plaintiff played no role in drafting the letters, he

- 20 -

did not review them before they were mailed, he had no input in the preparation of the letters, and most, if not all, of the disputed items identified in the letter were in fact not inaccurate. *Id.* at 918-921. Experian did not initiate a reinvestigation after it received these letters, finding that the letters were suspicious and not sent by the plaintiff. *Id.* at 920. The Ninth Circuit found that the plaintiff "played almost no part in submitting the dispute letter to Experian," "[h]e did not identify the items to be disputed," he did not review the letters before they were sent to Experian and "his testimony was that he played no role in preparing the letters at all." *Id.* at 921. For these reasons, the Ninth Circuit affirmed the district court's ruling granting Experian's motion for summary judgment.

Furthermore, the Ninth Circuit expressly stated that their "holding is limited to the facts before us," "[t]his case did not involve a letter sent to a consumer reporting agency by a consumer's attorney," and they are not deciding "whether, in any of these circumstances, a consumer reporting agency would have a duty to reinvestigate." *Id.* at 921.

Unlike the plaintiff in *Warner*, the Plaintiff here assisted her attorneys in the preparation of the Complaint by providing the relevant information regarding the factual allegations disputing the inaccurate information, including identifying the items to be disputed, and reviewed and approved of the Complaint before it was filed. (*Id.* at ¶47).The Complaint was filed on behalf of the Plaintiff and subsequently it was served directly upon the named defendants, including Experian. (*Id.* at ¶48). The Complaint disputed the completeness or accuracy of items of information contained within Plaintiff's file with Experian. Upon receipt of the Complaint, Experian deemed the claim viable, began its reinvestigation pursuant to 15 U.S.C. § 1681i(a) and contacted Defendant informing it of the dispute, affording Defendant

- 21 -

an opportunity to investigate and rectify erroneous reporting. (*Id.* at ¶49-50). For these reasons, the Court should find that Plaintiff's dispute was proper.

### b. *Roybal v. Equifax, Transunion, Experian, Rickenbacker, Medamerica, City Towing Body Shop, Inc.*, 405 F. Supp. 2d 1177 (E.D. Cal. 2005)

Defendant also cites to *Roybal* to support the contention that the Plaintiff did not somehow notify the CRAs of her dispute. Defendant's understanding and application of *Roybal* is misplaced. First, the plaintiffs in *Roybal* failed to allege that they "contacted the CRAs who, in turn, determined the claim was viable and contacted [the furnisher] triggering [the furnisher's] duty to investigate." *Id.* at 1180. This failure resulted in the dismissal of plaintiffs' FCRA claim with leave to amend. *Id.* at 1180. Even after the plaintiffs amended their complaint, the *Roybal* court ultimately granted the defendant furnisher's summary judgment finding that there was "absolutely no evidence that the CRAs notified [the furnisher] directly of the purported inaccuracies so as to trigger [the furnisher's] duty to investigate under the FCRA." *Roybal v. Equifax*, No. 2:05-CV-01207-MCE-KJM, 2008 U.S. Dist. LEXIS 145121, at *10-11 (E.D. Cal. Oct. 7, 2008).

Furthermore, it should be noted that upon receipt of a dispute, it is the credit reporting agency, **<u>NOT</u>** the furnisher, who determines if a dispute is viable or not. *Id.* at *9. Once a dispute is deemed viable by the credit reporting agency, the furnisher is contacted and "then afforded the opportunity to investigate and rectify erroneous reporting entries." *Id.* at *9-10; *(citing 15 U.S.C. § 1681s-2(b))*.

Here, Plaintiff filed the instant lawsuit which contained her dispute of the Accounts at issue. (*Id.* at ¶45). The Complaint was served upon Experian, who determined the dispute was viable pursuant to 15 U.S.C. § 1681i(a)(3). (*Id.* at ¶48-50). Experian proceeded to contact Defendant and "afforded" Defendant the

opportunity to investigate the dispute regarding the Accounts at issue and to rectify the erroneous reporting entries. (*Id.* at ¶50, 63).; *Roybal*, 2008 U.S. Dist. LEXIS 145121, at *10-11. Defendant received the disputes from Experian regarding the Accounts, thereby triggering Defendant's duties under 15 U.S.C. § 1681s-2(b). (*Id.* at ¶50-54, 63). For these reasons, the Court should find that Plaintiff's dispute was proper.[3]

### c. *Nelson v. Chase Manhattan Mortg. Corp., 282 F.3d 1057 (9th Cir. 2002)*

Defendant cites to *Nelson* to nonsensically suggest that an individual who files a lawsuit cannot thereafter allege an FCRA claim against a furnisher even if the furnisher violates its reinvestigation obligations under 15 U.S.C. § 1681s-2(b). *Doc. 103*, pg. 24 ¶2-9. *Nelson* does not stand for this and Defendant cannot point to any authority that states as much because no such authority exists.

In *Nelson,* the Ninth Circuit reversed and remanded the district court's dismissal holding that 15 U.S.C. § 1681s-2(b) did create a private right of action. *Id.* at 1058. Instead, the Ninth Circuit held that it was § 1681s-2(a) that did not create a private of right of action as expressly prohibited under § 1681s-2(c) and (d).

The duties and obligations of a furnisher as outlined in § 1681s-2(b) are not triggered until a furnisher receives notice "of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency." *See 15 U.S.C. § 1681s-2(b)(1).* On the other hand, the duties and obligations of a furnisher under § 1681s-2(a) are triggered each and every time

---

[3] Defendant also cites to *Peasley v. Verizon Wireless (VAW) LLC*, 364 F. Supp. 2d 1198 (S.D. Cal. 2005). However, *Peasley* is inapposite because the plaintiff admittedly alleges that he never notified a credit reporting agency of his dispute, and that he notified the defendant furnisher directly. *Id.* at 1200.

information is furnished – notification of a dispute is not required. *Nelson*, 282 F.3d at 1059.

It is for this reason that the Ninth Circuit held "[i]t can be inferred from the structure of the statute that Congress did not want furnishers of credit information exposed to suit by any and every consumer dissatisfied with the credit information furnished." *Id.* at 1060. And because § 1681s-2(a)'s furnisher duties are automatically triggered upon the furnishing of information, "Congress limited the enforcement of the duties imposed by § 1681s-2(a) to governmental bodies" and provided "a filtering mechanism in § 1681s-2(b)." *Id.* at 1060.

However, Plaintiff filed suit against Defendant alleging violations of Cal. Civ. Code § 1785.25(a). *See Doc. 01, generally*. While a furnisher's duties and obligations under § 1681s-2(a) are similar (if not closely identical) to the ones imposed under Cal. Civ. Code § 1785.25(a), Congress explicitly saved this section from preemption in the FCRA. *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1172 (9th Cir. 2009). Plaintiff was not prohibited from filing suit pursuant to Cal. Civ. Code § 1785.25(a), and further, Plaintiff is not prohibited from asserting claims for violations of 15 U.S.C. § 1681s-2(b) that occurred after the lawsuit was filed.

Defendant is requesting that this Court **effectively rewrite** § 1681s-2(b) and include a safe harbor provision that doesn't otherwise exist and that would provide immunity to a furnisher of information from any post-lawsuit violations of the law. Requesting the Court to make such a ruling illustrates Defendant's desperation to avoid liability for its reckless and willful conduct in reporting inaccurate information, both prior to the filing of the lawsuit and after.

- 24 -

### d. Continued reporting of inaccurate information after suit is filed and notification from a CRA supports a finding of willfulness

It is important to note that District Courts have found that a furnisher's continued reporting of inaccurate information after a lawsuit had been filed and after notification from a credit reporting agency can allow a jury to conclude that the furnisher's "conduct was objectively unreasonable and created 'an unjustifiably high risk of harm [to plaintiff] so obvious that it should [have been] known.'" *Austin v. Pawtucket Credit Union*, Civil Action No. 18-10699-FDS, 2019 U.S. Dist. LEXIS 145958, at *12 (D. Mass. May 17, 2019) (*quoting Safeco Ins. Co. of Am. V. Burr*, 551 U.S. 47, 68 (2007)); *See also, Hauge v. AmeriHome Mortg. Co., LLC*, 565 F. Supp. 3d 1, 10 (D. Mass. 2021) (denying defendant's motion for summary judgment and holding that "a jury can conclude that the defendant's continue reporting of the inaccuracy, in light of this lawsuit and additional, specific inquiries from the CRAs, is in conscious or reckless disregard of the plaintiff's rights.") (*citing Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1303 (11th Cir. 2019)).

A review of relevant case law makes clear that a consumer dispute to a credit reporting agency, even after the filing of a lawsuit, that results in the furnisher failing to conduct a reasonable investigation and continued reporting of inaccurate information, is **not** grounds for dismissal of the FCRA claim, but in fact supports a finding that the Defendant acted recklessly. For these reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion.

## V.   CONCLUSION

For all of the above reasons, Plaintiff respectfully requests that the Court deny Defendant's Motion in its entirety.

RESPECTFULLY SUBMITTED,

- 25 -

DATED: November 22, 2022

By: */s/ Youssef H. Hammoud*
Youssef H. Hammoud (SBN: 321934)
**PRICE LAW GROUP, APC**
6345 Balboa Blvd., Suite 247
Encino, CA 91316
T: (818) 600-5596
F: (818) 600-5596
E: youssef@pricelawgroup.com

David A. Chami (AZ: 027585)
(Admitted *pro hac vice*)
**PRICE LAW GROUP, APC**
8245 N. 85th Way
Scottsdale, AZ 85258
T: (818) 600-5515
F: (818) 600-5515
E: david@pricelawgroup.com

*Attorneys for Plaintiff,*
*Mayra Aranda*

- 26 -

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 22, 2022, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notice of such filing to all attorneys of record in this matter. Since none of the attorneys of record are non-ECF participants, hard copies of the foregoing have not been provided via personal delivery or by postal mail.

**PRICE LAW GROUP, APC**

*/s/ Roxanne Harris*

- 27 -